**In the Matter of CENTURY BRASS PRODUCTS, INC., Debtor.**

**Bankruptcy No. 2–85–00197.**

United States Bankruptcy Court, D. Connecticut.

Oct. 31, 1989.

---

Frederic E. Mascolo, Moynahan, Ruskin, Mascolo, Mariani & Minnella, Waterbury, Conn., for Frank Santaguida, claimant.

Robert A. White, Murtha, Cullina, Richter & Pinney, Hartford, Conn., for debtor.

David J. Heinlein, Rogin, Nassau, Caplan, Lassman & Hirtle, CityPlace, Hartford, Conn., for Plan Adm'r.

Richard Levy, Jr., Milgrim, Thomajan & Lee, P.C., New York City, Counsel and Representative for Retired Employees of debtor.

## MEMORANDUM AND ORDER RE: OBJECTION TO REQUESTS OF FRANK SANTAGUIDA FOR PAYMENT OF ADMINISTRATIVE EXPENSE

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

### ISSUE

The parties to this proceeding are at issue over the allowance of two administrative expense claims filed by Frank Santaguida (Santaguida).[1] Claim No. 1566, filed on August 8, 1988, is in the amount of $120,000.00 and asserts the consideration for the debt or ground of liability as a "Post Petition Agreement." Claim No. 1426, filed on December 31, 1987, seeks $9,275.76 for 1985, 1986 and 1987 "Vacation Pay."

### II.

### BACKGROUND

On March 15, 1985, Century Brass Products, Inc., the debtor, filed a bankruptcy petition under chapter 11. Santaguida, an employee of the debtor since 1978, was then a vice-president of the debtor employed under an employment agreement dated December 1, 1983 and covering a period commencing December 1, 1983 and ending April 15, 1986. The debtor's attempts to reorganize its business ceased on June 30, 1986, when the Court of Appeals for the Second Circuit reversed the bankruptcy and district courts' rulings that the debtor, pursuant to 11 U.S.C. § 1113, was authorized to reject a collective bargaining agreement. *See In re Century Brass Products, Inc.*, 795 F.2d 265 (2d Cir.1986). Shortly thereafter, the debtor, the unsecured creditors' committee (committee) and other interested parties determined, in effect, to terminate the debtor's corporate existence and immediately to start a search for buyers for the debtor's business and assets.

In August 1986, Lewis Segal, the debtor's then president, during an informal meeting, suggested to Robert A. White (White), one of the debtor's attorneys, and to Jerome E. Caplan (Caplan), attorney for the committee, that new employment contracts be entered into with three of the debtor's officers, including Santaguida. The proposed contracts would include substantial severance-pay benefits in order to provide security for the officers in light of a threatened stockholder replacement of the debtor's board of directors. Both White and Caplan advised Segal that such agreements would require notice to creditors, a hearing, and court approval. Segal was further advised that if a court hearing were sought, the proposed agreements would likely be contested, court approval was not certain, and the estate had too many other problems with which to deal. Segal, who during the trial denied recalling any such advice, went ahead and secured the board of directors' approval (two mem-

---

1. 11 U.S.C. § 503, entitled "Allowance of administrative expenses," provides in part:
   (a) An entity may file a request for payment of an administrative expense.
   (b) After notice and a hearing, there shall be allowed administrative expenses ... including—
   (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....
   11 U.S.C. § 503 (1988).

bers voting, including Segal) of the agreements, including the one with Santaguida. The agreement, dated September 9, 1986, stated, on page one, that it was "Privileged and Confidential" and that it was based upon "potentially disturbing circumstances arising from the Chapter 11 proceeding." The parties to the agreements did not submit them to the court for approval, and neither White, Caplan nor any members of the committee were aware of their existence for approximately a year after their execution. The debtor terminated Santaguida's employment on April 30, 1988.

During 1987, buyers for the bulk of the debtor's assets were found. After many months of negotiation with representatives of former salaried and union employees, secured creditors, the State of Connecticut (concerning serious environmental problems), The Pension Benefit Guaranty Corporation and many other parties, the debtor proposed a plan of liquidation to distribute the sales proceeds. The overriding function of the plan was to resolve by compromise the numerous administrative-expense claims which, in amount, exceeded the sales proceeds. Unsecured, nonpriority creditors were advised in the disclosure statement that they likely will receive nothing from the estate. The plan recently has been confirmed, and the Santaguida and one or two other administrative-expense claims remain to be resolved.

In order to secure the vital information of the total amounts sought by the administrative-expense claimants, the court, on November 25, 1987, entered an order setting January 4, 1988 as the last date, with certain exceptions, by which a request for payment of an administrative expense could be filed. The debtor sent notice of this bar date by December 1, 1987 to all potential claimants, including Santaguida, and he concedes that he timely received such notice.

## III.

### CLAIM NO. 1566

The debtor, the committee [2] and the Representative for Retired Employees are the objectors to Santaguida's claims. They first assert that claim No. 1566, having been filed on August 8, 1988, seven months after the January 4, 1988 bar date, is untimely and thereby barred on that account alone. Santaguida contends that he was not told until May, 1988 that the debtor would not recognize the enforceability of his contract, and, accordingly, he had no reason to file a claim on January 4, 1988.[3] He asserts that the court should apply the "excusable neglect" standard under Bankruptcy Rule 9006(b),[4] despite his lack of a motion for enlargement of time, and permit his claim to be considered. The court received testimony from both White and Roy C. David, the debtor's president following the resignation of Segal, that by September 1987, they had separately advised Santaguida that his severance-pay agreement was unenforceable because it had never been noticed to creditors and presented to the court for approval. I credit this testimony and conclude that Santaguida, even assuming (but not deciding) the validity of his argument of "ignorance of a claim," should have known that he held a disputed

2. Under the provisions of the confirmed plan, the committee has been replaced by the Plan Administrator, and counsel for the committee became counsel for the Plan Administrator.

3. The claim filed on August 8, 1988 is dated June 17, 1988.

4. Bankruptcy Rule 9006(b) provides:
   (b) *Enlargement.*
   (1) *In General.* ... when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the request therefor is

made before the expiration of the period originally prescribed or as extended by a previous order or (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.
Bankr.R. 9006(b).
   "Excusable neglect is present when a party fails to meet an obligation due to 'unique or extraordinary' circumstances 'which [are] beyond the reasonable control' of the delinquent party." *Hassett v. Weissman (In re O.P.M. Leasing Services, Inc.),* 48 B.R. 824, 830 (S.D.N.Y. 1985) (citations omitted).

claim and that his claim had to be filed by January 4, 1988. Furthermore, I find that no equitable considerations exist to overcome Santaguida's disregard of the bar date in light of the significance of the bar date to arrive at a final resolution of this case. *See In re South Atlantic Financial Corp.*, 767 F.2d 814 (11th Cir.1985); *In re Century Brass Products, Inc.*, 72 B.R. 68 (Bankr.D.Conn.1987); *Hassett v. Weissman (In re O.P.M. Leasing Services, Inc.)*, 48 B.R. 824 (S.D.N.Y.1985).

The objectors further assert that the agreement, not having been noticed to creditors and approved by the court, is invalid and avoidable. Code § 363(c)(1) authorizes a debtor in possession operating the debtor's business under Code § 1108[5] to enter into "transactions ... in the ordinary course of business, without notice or a hearing.... " Transactions not in the ordinary course of business obviously require notice and hearing and court authorization.[6] *See* § 363(b)(1). Santaguida asserts, and the objectors deny, that his severance-pay agreement was entered into in the ordinary course of business. The agreement provided for one year of severance pay to Santaguida upon his termination by the debtor, continued use of a car for one year with all costs paid by the debtor, continued payment by the debtor for medical insurance for one year, payment by the debtor for all legal fees and expenses incurred by Santaguida as a result of his termination, and no need for Santaguida to mitigate any damages. Segal acknowledged, while testifying, that during his prior seven years of service as president of the debtor, no comparable agreement had ever been entered into. The severance-pay provisions represented a radical departure from any prior severance-pay benefits granted to any of the debtor's employees.

The accepted test for determining whether a transaction is within the ordinary course of business was first and best artic-

ulated in *Armstrong World Industries, Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391 (S.D. N.Y.1983).

The legislative history of § 363 provides no test or guideline concerning the scope of the "ordinary course of business" standard. Nonetheless, the apparent purpose of requiring notice only where the use of property is extraordinary is to assure interested persons of an opportunity to be heard concerning transactions different from those that might be expected to take place so long as the debtor in possession is allowed to continue normal business operations under 11 U.S.C. § 1107(a) & § 1108. The touchstone of "ordinariness" is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business.

*Id.* at 394. (Citations omitted). *See also Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704–06 (9th Cir.1988); *Committee v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 60 B.R. 612 (Bankr.S.D.N.Y. 1986), *rev'd on other grounds*, 801 F.2d 60 (2d Cir.1986); *Johnston v. First Street Companies (In re Waterfront Companies, Inc.)*, 56 B.R. 31 (Bankr.D.Minn.1985).

Utilizing this test, I have no hesitancy whatsoever in concluding that the nature of Santaguida's agreement required notice to creditors, a hearing and court approval in order to be effective. It is clearly the type of transaction which creditors expect to have notice of in view of its potential impact on increasing the administration expenses of an estate. Creditors do not anticipate that, based upon a fear of change of corporate control, substantial severance-pay benefits secretly will be granted to selected management employees. Furthermore, with the troubled histo-

---

5. Section 1108 provides:
   "*Authorization to operate business.*
   Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business."

11 U.S.C. § 1108 (1988).

6. Section 549 states that postpetition transactions which are "not authorized under this title or by the court" may be avoided. 11 U.S.C. § 549 (1988).

ry of this case in mind, it is more likely than not that had a contested hearing been held on the approval of this agreement, approval would not have been granted.

The objectors have advanced additional substantive reasons why Claim No. 1566 should not be allowed, but in view of the findings and conclusions already reached, it would unduly lengthen this ruling to discuss them.

Claim No. 1566 will be disallowed, and it is

SO ORDERED.

## IV.

### CLAIM NO. 1426

By this claim, timely filed on December 31, 1987, Santaguida seeks two-and-one-half weeks of annual vacation pay for the years 1985 and 1986 and one week for 1987, all at the weekly pay rate of $1,538.46. He attached to his claim a copy of page one of a "Standard Practice" form from the debtor's "Salaried Employee Manual." This document states that employees with five to ten years' service qualify for two-and-one-half weeks of annual vacation pay.

At trial, Santaguida testified that he was too busy to take a vacation in 1985 and 1986. He claimed he took two weeks' vacation in 1987, but that it was company policy to allow three weeks' vacation after seven years' service, so that he had one week due for 1987.[7] By agreement with the chairman of the committee, he took his full vacation time in 1988, prior to his termination at the end of April 1988.

Joseph Formica, a former vice-president of the debtor, called by Santaguida as a witness, testified on cross-examination that, under the debtor's company policy, employees lost vacation time if not taken in the year earned. The objectors introduced into evidence page two of the debtor's "Salaried Employee Manual" which, with exceptions not material, stated that "Vacations must be taken within the calendar

year." The objectors also produced a written report, prepared under Santaguida's direction and dated September 24, 1987, which set out vacation entitlements, "based on present Century Brass written policy," of those employees who, due to the sale of the debtor's business, were being terminated. That report showed Santaguida's entitlement as $4,410.95, apparently even including vacation time from prior years. Santaguida testified that he took additional vacation time in 1987 after September 24th.

■■■ Since an administrative expense not only is an allowance against the estate but also enjoys a priority over other claims, any administrative claim must be subject to the strict scrutiny of the court. *See Matter of Cott Corp.*, 47 B.R. 487, 491 (Bankr. D.Conn.1984). The burden is on the claimant to prove by a preponderance of the evidence the validity of his claim. *Matter of Patch Graphics*, 58 B.R. 743, 745 (Bankr.W.D.Wis.1986); *In re U.S. Lines, Inc.*, 103 B.R. 427 (Bankr.S.D.N.Y.1989). Santaguida's post-trial brief addresses none of the discrepancies between Claim No. 1426 and the testimony received at trial, but simply asserts that Santaguida never "negotiated away" his right to vacation pay. I conclude that Santaguida has failed to establish, by a preponderance of the evidence, that he is entitled to payment for accrued vacation time for the years 1985, 1986 and 1987.

The Plan Administrator's post-trial brief concedes that Santaguida is entitled to unpaid wages for the last week of April 1988. Accordingly, Claim No. 1426 will be allowed for that amount. It is

SO ORDERED.

## ORDER

The objections of the debtor, the unsecured creditors' committee and the Representative for Retired Employees in the above-captioned case, Century Brass Products, Inc., to two administrative expense claims, Claim No. 1566 and Claim No. 1426,

---

7. The "Standard Practice" form from the debtor's "Salaried Employee Manual" states that an employee must have at least ten years of service before he or she is entitled to three weeks' vacation per year.

filed by Frank Santaguida, having been heard, and the court having filed a Memorandum of Decision containing Findings of Fact and Conclusions of Law, it is hereby

ORDERED, ADJUDGED AND DECREED that Claim No. 1566 is disallowed, and it is

FURTHER ORDERED, ADJUDGED AND DECREED that Claim No. 1426 is allowed in an amount equal to unpaid wages for the last week of April 1988 and is disallowed for accrued vacation time for the years 1985, 1986 and 1987.