**In re MEDIA CENTRAL, INC., Debtor.**

**Bankruptcy No. 1–87–01483.**

United States Bankruptcy Court,
E.D. Tennessee.

April 4, 1990.

---

See also, Bkrtcy., 89 B.R. 685.

C. Douglas Williams, Chattanooga, Tenn., for debtor.

Russell H. Hippe Jr., Nashville, Tenn., for Joint Unsecured Creditors' Committee.

James A.S. Wilson, Chattanooga, Tenn.

Harold A. Schwartz Jr., Chattanooga, Tenn.

William R. Sonnenburg, Asst. U.S. Trustee, Chattanooga, Tenn.

## MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

The issue presented in this case is whether postpetition contracts entered into between the debtor and its management team that provided one year severance pay benefits to management team employees were transactions or the incurring of debt in the ordinary course of debtor's business which did not require notice and hearing or court authorization.

### I.

On February 20, 1990, the debtor filed a motion for approval of payments pursuant to two postpetition contracts entered into between the debtor and two of its management employees, Donald Kent and Clifford Curley. These contracts, dated July 1, 1988, generally provide severance pay benefits totaling one year's salary to the affected employee if the employee is terminated resulting from events not within the control of the debtor's board of directors. Both Donald Kent and Clifford Curley were terminated by the debtor effective March 1, 1990. The debtor, Donald Kent, and Clifford Curley maintain the terminations of both Kent and Curley were caused by events outside the control of debtor's board. Consequently, these parties argue the debtor should be authorized to pay severance pay benefits to Kent and Curley pursuant to the contracts.

The debtor's motion is opposed by the Unsecured Creditors' Committee and by the United States Trustee. It is the contention of these parties the debtor was required to provide notice and hearing and to seek court approval before entering into these postpetition contracts, and that the failure to provide such notice and hearing or to obtain court approval renders the contracts invalid for purposes of allowing a claim against the estate.

### II.

The debtor, Media Central, Inc., (Media) filed its chapter 11 petition in this case on July 2, 1987. The debtor's business consisted of managing eight television stations

pursuant to management contracts. At the time Media filed its petition, the stations it managed were WDBD in Jackson, Mississippi, WKCH in Knoxville, Tennessee, WZDX in Huntsville, Alabama, WOAL in Canton, Ohio, KZKC in Kansas City, Missouri, KHAI in Honolulu, Hawaii, KBSI in Cape Girardeau, Missouri, and WXTX in Columbus, Georgia. All the stations were owned by partnerships. In all but one of the stations Media held, directly or indirectly, general partnership interests. Six of the station partnerships filed petitions for relief under chapter 11 approximately the same time Media filed its petition. Two of the station partnerships, Jackson Television, Ltd. and Canton 67, Ltd., had involuntary chapter 11 petitions filed against them, but the partnerships later agreed to the entry of orders of relief.

The majority stockholder of Media Central is Morton Kent who is also Media's board chairman. He, together with his sons Stephen, Donald, and David Kent along with two non-family members, John Pauza and Clifford Curley, made up the Media Central management team at least through March 1, 1990.

Donald Kent first came to Media in 1983 and initially handled real estate acquisitions for Media. Later he became Media's president and was serving in this capacity when the debtor's bankruptcy petition was filed. Clifford Curley was hired by Media shortly after it filed bankruptcy. Although he was aware of the bankruptcy filing, Curley believed Media had the potential to recover from its financial problems through a successful reorganization.

From the beginning Media and its management team controlled the station debtors. In fact, one law firm was appointed to represent both Media and the station debtors. Early on, Media attempted to reorganize by proposing plans on behalf of itself and the station debtors that would have changed the partnership structure of most of the station debtors to corporate subsidiaries of Media. Media's plan was met with vigorous resistance from practically all major creditor groups.

After Media and the stations failed to obtain adequate support for their plans, the court denied further requests by Media and the station debtors for an extension of the exclusivity period for filing debtor plans. Consequently, the exclusivity period expired and June 20, 1988, was set as the deadline for filing competing plans. Competing plans were filed in a number of the station debtor cases providing for the sale of these stations. It thus became obvious to all concerned that a sale of one or more of the stations was a real possibility if one or more of the competing plans were confirmed.

The board of directors of Media held a board meeting on June 28, 1988. The directors present were Morton Kent, David Kent, Donald Kent, Stephen Kent, L.M. Clymer, and Thomas Hudson. During this board meeting, Morton Kent brought up the need for severance pay contracts, described as a job security plan, for certain key employees of the debtor which included Media's management team. The minutes of the board meeting summarize the board's action on Morton Kent's proposal as follows:

Morton Kent discussed the necessity for a job security program to keep key employees. It was proposed that Media Central would pay one year's complete salary to those key employees on employment termination as a result of events not under the control of this Board. Mr. Hudson indicated that Murray of Ohio had recently installed a three year plan very similar to what was being discussed. Mr. Hudson moved, subject to approval of counsel and approval of the Board, a one year severance job security plan. Mr. Clymer suggested that the vote be taken only by nonparticipating Board members. As a result, a vote was taken and the motion was approved by positive votes of Mr. Clymer and Mr. Hudson. All other Board members abstained.

Immediately after the board meeting, Morton Kent told Clifford Curley the board had approved a job security plan for the Media management team and that Curley would receive a severance pay contract.

Curley admitted during his testimony he was pleasantly surprised by this development. Curley was also advised the board had elected him vice president of Media.

Sometime in July 1988, Curley received and executed the severance pay contract. The contract provided in relevant part as follows:

THAT WHEREAS, the Employee renders services for the Employer as Vice President; and

WHEREAS, the Employer is a debtor in Chapter 11 proceedings in the United States Bankruptcy Court for the Eastern District of Tennessee; and

WHEREAS, the Employer considers the Employee to be a key employee and strongly desires to continue the employment of the Employee to assure stability and continued profitable operations of the Employer during its Chapter 11 proceedings and as a reorganized debtor;

NOW, THEREFORE, in consideration of the premises and of the agreement of the Employee to continue employment with the Employer as an employee at will, the Employer agrees to pay to the Employee cash in an amount equal to the total compensation of the Employee for one year, based on the compensation rates then in effect upon the involuntary termination of the Employee resulting from events not within the control of the Board of Directors of the Employer as presently constituted. This Agreement for severance pay shall not apply in the event of the death of the Employee.

Curley testified had it not been for the severance pay contract, he would not have stayed with Media until March 1990. He did admit he never threatened to resign prior to receiving the severance pay contract nor had he demanded such a benefit as a condition to staying with Media.

Donald Kent likewise signed a severance pay contract with Media in July 1988. The content of the contract was the same as that provided to Curley. Donald Kent also testified he never threatened to leave Media nor did he demand a severance pay contract as a condition for staying with Media. He stated the contract did provide

him added security so that he did not have to choose between his commitment to his father, brothers, and Media and his commitment to his family.

Although proposed by Morton Kent, the job security program was approved by the two board members who were not direct beneficiaries of the severance pay contracts. These two board members, L.M. Clymer and Thomas Hudson, believed it appropriate to grant the Media management team a degree of economic security in view of the uncertainties presented by the bankruptcy case. In this way, they felt the management team could be kept intact during the bankruptcy case.

In addition to the severance pay contracts provided to Donald Kent and Clifford Curley, similar contracts were also provided to the other members of Media's management team, Morton Kent, Stephen Kent, David Kent, and John Pauza. As a result of these contracts, Media acquired a contingent postpetition liability in the approximate amount of $520,000. No notice and hearing was given nor was court approval sought prior to the time Media incurred this postpetition liability. The contingent liability came to light in approximately December 1989 when it appeared on the debtor's monthly financial report filed with the court.

Even though the board minutes stated the job security plan was subject to approval of counsel, it was unclear from the proof whether counsel actually approved the plan. Donald Kent testified he may have discussed with Media's counsel that the severance pay contracts were not matters that needed court approval.

Since the severance pay contracts were executed, most of the stations have been sold or are being operated by liquidating trustees pursuant to confirmed plans. At the present time, Media is managing only two of the stations and a sale is expected to close shortly on one of those stations. The sales of the stations have necessitated a cutback of management employees at Media. Consequently, Morton Kent advised both Donald Kent and Clifford Curley they would be terminated from their employ-

ment at Media effective March 1, 1990. The terminations resulted in the instant motion being filed by the debtor requesting authorization to pay both Donald Kent and Clifford Curley one year's salary as severance pay pursuant to the severance pay contracts. In Donald Kent's case, the one year salary would total $90,000; in Clifford Curley's case, the one year salary would also total $90,000.

Although the board of directors annually considered and passed upon salaries of Media's officers and management team, prior to June 1988 it had never provided severance pay benefits to any of the management employees.

### III.

At all relevant times, Media has been a debtor-in-possession having the rights and duties of a trustee. 11 U.S.C.A. § 1107(a) (West Supp.1989). Under the provisions of chapter 11, a trustee, or in this case a debtor-in-possession, may operate the debtor's business unless the court orders otherwise. 11 U.S.C.A. § 1108 (West Supp.1989). Certain limitations, however, are placed upon the business operations. Those limitations are set forth in § 363 and § 364 of the Bankruptcy Code. The relevant portions of those statutes applicable here are as follows:

> (c)(1) If the business of the debtor is authorized to be operated under section ... 1108 ... of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.A. § 363(c)(1) (West Supp.1989).

> (a) If the trustee is authorized to operate the business of the debtor under section ... 1108 ... of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of busi-

ness allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C.A. § 364(a) (West Supp.1989).

The severance pay contracts entered into between the debtor-in-possession and its management team constitute both postpetition transactions and the incurring of postpetition debt. Even though the contracts created mere contingent liabilities of Media, the term "debt" means liability on a claim and the term "claim" includes any right to payment whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. 11 U.S.C.A. § 101(11), (4) (West 1979); *see Johnston v. First Street Cos. (In re Waterfront Cos.)*, 56 B.R. 31 (Bankr.D.Minn.1985). As can be seen from § 363(c)(1) and § 364(a), a trustee or debtor-in-possession can enter into postpetition transactions and incur postpetition unsecured debt in operating the debtor's business without providing notice and hearing if the transaction or incurring of debt is in the ordinary course of business. If the transaction or incurring of unsecured debt is not in the ordinary course of debtor's business, notice and hearing or court authorization is required.

Neither the Bankruptcy Code nor legislative history provides a definition of the phrase "ordinary course of business." Courts that have considered the meaning of the phrase, however, have offered at least two approaches which are helpful in ascertaining whether a particular postpetition transaction is in the ordinary course of business.

One approach is to focus upon the creditor's expectation; that is, one views the disputed transaction from the creditor's vantage point and inquires whether the creditor would expect notice and hearing on the contemplated transaction. *See Burlington N.R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700 (9th Cir.1988); *In re Century Brass Prod.*, 107 B.R. 8, 11 (Bankr.D.Conn.1989); *Committee v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 60 B.R. 612, 616–18 (Bankr.S.D.N.Y.1986); *Johnston v.*

First Street Cos. (In re Waterfront Cos.), 56 B.R. at 35; Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391 (S.D.N.Y.1983). If the transaction is an ordinary one in the debtor's business operation, the creditor would not expect notice and opportunity to object because the creditor is well aware the debtor-in-possession has been authorized by the Code to operate its business in the usual manner from day to day. On the other hand, if the contemplated transaction is unusual, out of the ordinary, the type of transaction that might be considered controversial or questionable for the debtor to undertake during its chapter 11 case, the creditors would expect to be notified and provided an opportunity to object. Even if the debtor-in-possession believes its contemplated action would be beneficial to the estate, and even if it later turns out the transaction was beneficial to the estate, if the transaction is not in the ordinary course of business, creditors still have the right to notice and hearing before the transaction is entered into. As one district court has explained:

> [T]he apparent purpose of requiring notice only where the use of property is extraordinary is to assure interested persons of an opportunity to be heard concerning transactions different from those that might be expected to take place so long as the debtor in possession is allowed to continue normal business operations under 11 U.S.C. § 1107(a) & § 1108. The touchstone of "ordinariness" is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business.

Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. at 394.

Another approach is to compare the debtor's business with like businesses to ascertain whether the disputed transaction is ordinary for the particular type of business concerned. Under this approach, the test is "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." Burlington N.R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.), 853 F.2d at 704; see also Committee v. Johns–Manville Corp. (In re Johns–Manville Corp.), 60 B.R. at 618; Johnston v. First Street Cos. (In re Waterfront Cos.), 56 B.R. at 34–35. As one court observed in illustrating this approach, "raising a crop would not be the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business." Johnston v. First Street Cos. (In re Waterfront Cos.), 56 B.R. at 35.

The two approaches or tests have been characterized by some courts as two dimensions to the concept of ordinary course of business. The creditor expectation test has been called the vertical dimension, and the comparable businesses test has been called the horizontal dimension. See Burlington N.R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.), 853 F.2d at 704–06; Committee v. Johns–Manville Corp. (In re Johns–Manville Corp.), 60 B.R. at 616–19; Johnston v. First Street Cos. (In re Waterfront Cos.), 56 B.R. at 34–35. Regardless of the labels used, however, both tests or dimensions provide an analytical framework for determining whether a transaction is in the ordinary course of business. If either test or dimension is not satisfied, most likely the disputed transaction is not in the ordinary course of business.

The creditor's expectation test was recently utilized by a bankruptcy court faced with an issue similar to the one in this case. In In re Century Brass Prod., 107 B.R. 8 (Bankr.D.Conn.1989), the court was called upon to decide whether a postpetition severance pay agreement entered into between the debtor and debtor's former officer was a transaction in the ordinary course of debtor's business. The corporate debtor had filed a petition for relief under chapter 11 on March 15, 1985. Thereafter, the debtor's board of directors approved severance pay contracts for three of debtor's officers. The debtor's president had earlier told debtor's attorney and the committee's attorney the contracts were needed in order to provide security for the officers in light of a threatened stockholder replace-

ment of the board. Despite being told by both counsel the agreements would require notice to creditors, a hearing, and court approval, the debtor's president secured board approval of the agreements without providing notice to creditors and without obtaining court approval. *Id.* at 9–10.

One of the three officers who received a board-approved severance pay agreement was Frank Santaguida. The agreement, dated September 9, 1986, stated it was based upon "potentially disturbing circumstances arising from the Chapter 11 proceeding." Santaguida was terminated by the debtor on April 30, 1988. The debtor ended up filing a liquidating plan and Santaguida filed an administrative expense claim for severance pay based upon the postpetition severance pay agreement. *Id.* at 10. The court noted that no comparable severance pay agreement had been entered into between the debtor and its officers prior to the postpetition severance pay agreements and that the severance pay provisions represented a radical departure from any prior severance pay benefits given to any of debtor's employees. The agreement provided for one year's severance pay to Santaguida upon his termination, continued use of a car for one year with expenses paid for by the debtor, continued payments by the debtor for Santaguida's medical insurance for one year, payment of Santaguida's legal fees and expenses incurred by Santaguida as a result of his termination, and no requirement that Santaguida mitigate any damages. *Id.* at 11. Santaguida's total claim based upon the postpetition severance pay agreement was $120,000.

After noting the creditor's expectation test enunciated in *Armstrong World Indus. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.),* 29 B.R. at 394, the court stated:

Utilizing this test, I have no hesitancy whatsoever in concluding that the nature of Santaguida's agreement required notice to creditors, a hearing and court approval in order to be effective. It is clearly the type of transaction which creditors expect to have notice of in view of its potential impact on increasing the

administration expenses of an estate. Creditors do not anticipate that, based upon a fear of change of corporate control, substantial severance-pay benefits secretly will be granted to selected management employees. Furthermore, with the troubled history of this case in mind, it is more likely than not that had a contested hearing been held on the approval of this agreement, approval would not have been granted.

*In re Century Brass Prod.,* 107 B.R. at 11–12. The court went on to disallow Santaguida's administrative claim.

The creditor's expectation test used in *Century Brass* will likewise be applied to the facts in this case. Prior to the time Media's board of directors met in June 1988, the officers and management team of Media had never received severance pay agreements. Providing this type of benefit to the management employees was therefor not ordinary. In fact, the need for such contracts arose not from ordinary business events and occurrences, but rather from developments unique to a chapter 11 case. As a result of Media's inability to gain support for its proposed plans filed on behalf of it and the debtor stations, the exclusivity period for filing debtor plans expired and other interested parties were allowed to file competing plans. It was this event that appears to have triggered the proposal for severance pay agreements. The severance pay agreements were not proposed in the ordinary course of debtor's business; they were proposed to counteract what management perceived to be an ominous development in Media's chapter 11 case.

Creditors who strenuously sought to terminate the exclusivity period would not have expected the debtor to enter into generous severance pay agreements with its management team once competing plans were filed without being provided notice and hearing. Although the severance pay agreements were formally approved by the two noninterested board members, and although the two board members may have thought it appropriate to approve a job security plan for its management team to give the management employees a degree

of security in light of the uncertainties facing the debtor, this case is not unlike any other chapter 11 case in which there are degrees of uncertainty concerning the ultimate outcome of the case. It would be anomalous indeed for a debtor-in-possession in a chapter 11 case to be able to execute postpetition contracts with its management team, including insiders, providing substantial severance pay benefits, which had never been provided before, without allowing creditors the opportunity to be heard on the advisability and fairness of such a proposal. After all, the management team responsible for the debtor during the time it encountered financial problems necessitating a bankruptcy filing is often the same management team that operates the debtor postpetition. Granting management added security at the expense of prepetition creditors might not sit too well with those creditors whose own security has been lessened by management's inability to ensure the debtor could pay its debts when due.

Admittedly, there may be cases in which an essential management employee demands a postpetition severance pay agreement as the price for remaining with the troubled debtor. If such an agreement calling for substantial severance pay upon termination has never before been given by the debtor to a management employee, it is most likely not ordinary in the debtor's business. Instead, the demand for a severance pay agreement places the debtor in the position of having to decide in the course of its chapter 11 case whether the management employee is so essential to the debtor's rehabilitation efforts and a successful outcome of the case that the employee should receive a postpetition severance pay contract which in the event of the employee's termination will result in payment ahead of all other prepetition creditors. In this case, creditors rightly would have expected to receive notice and an opportunity to object before such a decision was made. The debtor had not been able to reorganize during its first year in chapter 11; competing plans had been filed calling for the sale of several of the debtor stations; the management team consisted

primarily of insiders; the idea for the severance pay agreements originated with Morton Kent, himself a beneficiary of the agreements along with his sons; no severance pay contracts had ever been issued before by the debtor; and the severance pay contracts placed a significant postpetition contingent liability against the estate. Under all of these circumstances, the creditor expectation test clearly mandates a finding the severance pay contracts required notice and hearing before they were entered into.

The holding in *Century Brass* is applicable here. The postpetition severance pay agreements issued to Donald Kent and Clifford Curley were not transactions or the incurring of postpettion debt in the ordinary course of debtor's business and thus were not authorized under the Bankruptcy Code or by the court. Administrative claims predicated upon such agreements cannot be allowed.

An order will enter denying debtor's motion.