**In re HUSTING LAND & DEVELOPMENT, INC., Reorganized Debtor.**

**No. 97–20309 JAB.**

United States Bankruptcy Court,
D. Utah,
Central Division.

Nov. 22, 2000.

.

Steven F. Allred, Steven F. Allred, P.C., Orem, UT, Duane H. Gillman, McDowell & Gillman, P.C., Salt Lake City, UT, for R.A. McKell Excavating, Inc.

R. Kimball Mosier, Parsons Davies Kinghorn & Peters, Salt Lake City, UT, for Chapter 11 Trustee.

F. Wayne Elggren, Neilson, Elggren, Durkin & Co., Salt Lake City, UT, for Chapter 11 Trustee.

George W. Pratt, Adam S. Affleck, Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT, for Webb Family Trust.

Daniel E. Garrison, Michael R. Johnson, Snell & Wilmer, Salt Lake City, UT, for Construct Tech, Inc.

Peter Kuhn, Salt Lake City, UT, for United States Trustee.

### MEMORANDUM DECISION AND ORDER

JUDITH A. BOULDEN, Bankruptcy Judge.

This is a contested matter arising from the application for allowance of administrative expense filed by R.A. McKell Excavating, Inc. (RAM) in the Chapter 11 case of Husting Land & Development, Inc. (Husting). The issue presented is whether or not the administrative expense claim of RAM is allowable as a post-petition debt incurred in the ordinary course of business pursuant to 11 U.S.C. § 364(a).[1] During a two-day evidentiary hearing, RAM presented evidence in support of its argument that the debt owed to it for infrastructure improvements made to Husting's real estate development was incurred in the ordinary course of business. In so doing, RAM offered, and the Court excluded, certain expert testimony on the basis that the failure to prove the reliability of the expert's methodology precluded the Court from considering his opinion as to whether the debt was incurred in the ordinary course of business. Upon careful consideration of the remaining evidence, the pleadings and arguments, and upon an independent analysis of applicable law, the Court concludes that, applying the creditor

---

1. All future references are to Title 11 of the United States Code unless otherwise noted.

expectations/vertical dimension test, the debt incurred by Husting was not in the ordinary course of its business and, accordingly, RAM's claim cannot be allowed as an administrative expense of the estate under § 503(b)(1).

## FACTS

Husting was incorporated in 1994 for the purpose of developing a sixty-one acre, three-phase, sixty-nine lot residential subdivision in Draper, Utah, commonly known as Galena Hills. The purchase price of the real estate, which was in excess of $1,075,-000, was subordinated by the seller to a $1,500,000 development loan. In connection with the development of the Galena Hills project, Husting was required by Draper City and the Salt Lake County Sewer Improvement District to post cash escrow bonds (the Escrow Accounts) in the aggregate amount of approximately $612,000 to ensure payment to all persons supplying labor, services, equipment, or material to the Galena Hills project. Husting could obtain incremental release of funds in the Escrow Accounts to pay for improvements once the municipalities had approved the installation of various phases of the infrastructure.

Adjacent to Galena Hills was another subdivision development project, Parkway Estates, owned by John Holmes Construction, Inc. and Holmes Mesa Construction, Inc. (Holmes Mesa). Because Galena Hills required access through the Parkway Estates property, and Galena Hills and Parkway Estates shared common areas and roadways, it was necessary to install certain improvements and utilities that would benefit both subdivisions. Thus, Husting and Holmes Mesa entered into an Adjoining Subdivisions Agreement in which Husting agreed to complete certain improvements on Parkway Estates, and Holmes Mesa agreed to reimburse Husting on a pro rata basis for its construction expenses. The Adjoining Subdivisions Agreement provided that reimbursement funds would not be paid to Husting until twenty-four months after final inspection and approval of construction by various municipalities, and then only if certain other conditions were met.

In February 1996, Husting entered into a Development Agreement with Construct Tech, in which Construct Tech agreed to provide excavation and construction services for the Galena Hills project, including storm drains, sewer, curb and gutter, sidewalk and street improvements. Construction on Galena Hills and the adjoining Parkway Estates subdivision was to begin in April of 1996. However, Construct Tech did not actually break ground on the project until June of that year. From its inception, the relationship between Husting and Construct Tech was fraught with problems and disagreements. Husting's sole shareholder and president, Leon Harward (Harward), provided uncontroverted testimony that Construct Tech's work was incomplete, substandard and defective. Ultimately, in November of 1996, Hustings terminated its contract with Construct Tech.

As a result of difficulties encountered with Construct Tech, the Galena Hills project was seriously behind schedule and Husting was unable to meet payment obligations on its construction financing. On January 14, 1997, Husting, as debtor-in-possession, filed its voluntary petition for relief under Chapter 11. At the time of its Chapter 11 filing, Husting's intention for reorganization was to complete necessary subdivision improvements to Galena Hills and then sell the improved lots to pay secured and unsecured creditors.

In February 1997, Harward and Rick McKell (McKell), President of RAM, visited the Galena Hills site to assess the work necessary to correct defects in the excavation and construction work and complete the project. At the site, McKell observed open trenches, pipelines that were not backfilled, lidless manholes and a number of other deficiencies. After further discussion between the parties, Harward invited RAM to bid on the project. RAM's bid

proposal, for work on sewer, water, storm drain, irrigation and site work, totaled $258,191.40. In April 1997, Husting and RAM entered into a post-petition agreement (Construction Agreement), whereby RAM agreed to correct the defective work performed pre-petition by Construct Tech and to complete the remaining work on Phase II of the Galena Hills and Parkway Estates projects on a time and materials basis. The Construction Agreement provides as follows:

2. Contract Sum: The owner shall pay the Contractor in current funds for the Contractor's performance of the Contract, subject to additions and deductions as provided for herein, as follows:

A. During the process of correcting the other contractor's work to meet City and Sewer District requirements, R.A. McKell Excavation will invoice on a time and materials basis. Once deficiencies have been corrected progress can then proceed at agreed to unit price basis.

3. Progress Payments:

B. Based upon application for payment submitted to the Owner by the Contractor, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided herein. The period for payment shall be bi-weekly or as determined by the contractor but at no time will the billing period be less than bi-weekly. Owner agrees to make prompt application for payment from the escrow accounts presently established for the pur-

pose of providing funds to pay the Contract Sum....

RAM Exhibit 11, Construction Agreement at ¶¶ 2 and 3.

Prior to entering into the Construction Agreement, RAM was aware that Husting had filed for relief under Chapter 11 and understood that the only present sources of payment for its work was the approximate $612,000 in the Escrow Accounts established pursuant to the bonds with Draper City and the Salt Lake County Sewer District. However, Harward also led McKell to believe that other sources of payment existed, included the Adjoining Subdivisions Agreement, and funds from Castle Homes, L.L.C., a third-party investor that purportedly intended to purchase and build homes on the lots once the underground and surface improvements had been completed by RAM,[2] and to otherwise invest in Husting in some fashion.[3] Husting did not obtain Court approval for incurring post-petition unsecured debt under the terms of the Construction Agreement.

Shortly after RAM began working on the Galena Hills and Parkway Estates projects, it became apparent that neither McKell nor Husting had realized the scope of corrective work that would have to be done. Indeed, rather than simply correcting Construct Tech's deficiencies, most of the culinary and sanitary water lines and systems previously installed had to be completely removed and replaced. As a result, the invoices RAM submitted to Husting over the next several months on a time and materials basis exceeded his original bid proposal and the amounts held in the Escrow Accounts. Finally, in Novem-

---

2. Harward's representations to McKell regarding Castle Homes' investment in the Galena Hills project was presumably based on the fact that Castle Homes had tendered earnest money to Husting for the purchase of 36 lots. *See* RAM Exhibit 42. By letter dated January 29, 1997, Michael D. Alvey of Castle Homes informed Husting of its "intent to honor purchase and lot take down agreement as represented by our earnest money." *See* RAM Exhibit 27.

3. Amendments to Husting's Statement of Affairs indicate that effective June 17, 1997, Harward's equity interest in Husting was purchased by Castle Homes and Pro Built Co., and that Michael D. Alvey had become Husting's president. No other evidence was presented that clarified how Castle Homes was to infuse funds into Husting, and no § 364 motion related to Castle Homes was filed.

ber of 1997, RAM ceased performing under the Construction Agreement because Husting and/or third parties had failed to pay past-due invoices and because further payment or funding from the Escrow Accounts, the Adjoining Subdivisions Agreement and third-party investors appeared unlikely to materialize in the near future. In the seven months between May and November of 1997, RAM invoiced $969,633.08 to Husting for materials and labor supplied for performing corrective work and making improvements to the Galena Hills and Parkway Estates projects. During the same period, Husting paid RAM $371,640.57 with funds obtained through partial release of funds in the Escrow Accounts.

In April 1998, three months after the Trustee was appointed in the Husting Chapter 11 case upon Husting's own motion, RAM filed a Motion for Allowance of Administrative Expense (Motion) in which it claimed $648,444.77 in principal and interest as of January 15, 1998. The Trustee and various creditors objected to RAM's Motion. Hearing on the Motion was continued several times at RAM's request. In the interim, a plan of reorganization proposed by the Trustee was confirmed under which the Court retained jurisdiction to resolve the issues raised in the Motion. An evidentiary hearing on the Motion was held and, after the close of RAM's evidence, the Trustee moved for a judgment on partial findings pursuant to Fed. R.Bankr.P. 7052(c) on the grounds that RAM had not met its initial burden of proving it was entitled to allowance of an administrative claim under § 364(a), whereupon the Court took the matter under advisement. As of September 1, 2000, the date the evidentiary hearing began, RAM asserts that its administrative expense claim totaled $874,820.85 in principal and interest.

## ISSUE

The parties agree that the primary issue is whether or not Husting's debt to RAM was incurred in the "ordinary course of business" under § 364(a), such that court approval was not required for the administrative claim to be allowed and paid under the confirmed plan.

## DISCUSSION

### A. Jurisdiction

This Court has jurisdiction over the parties and subject matter of this contested matter under 28 U.S.C. § 1334, Article XIV of the Plan of Reorganization Proposed by Trustee, and ¶ 16 of the Order Confirming Plan of Reorganization Proposed by Trustee. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), and the Court has authority to enter a final order. Venue is proper in the Central Division of the District of Utah under 28 U.S.C. § 1409.

### B. Burden of Proof

■ The party claiming entitlement to administrative expense priority has the burden of proof. *In re Amarex,* 853 F.2d 1526, 1530 (10th Cir.1988); *In re Robinson,* 225 B.R. 228, 230 (Bankr.N.D.Okla. 1998). In order to fall within the ambit of § 503(b)(1), RAM must demonstrate that the post-petition unsecured credit extended to Husting was extended, and the debt was incurred, in the ordinary course of Husting's business.

### C. Analysis of "Ordinary Course" under Section 364(a)

■ The ability of a trustee or a debtor-in-possession to incur unsecured debt allowed as an administrative expense under § 503(b)(1) is governed by §§ 364(a) and (b) of the Code. Under § 364(a), an unsecured debt incurred post-petition is allowable as an administrative expense only if incurred in the ordinary course of a debtor's business. Otherwise, § 364(b) requires court authorization after notice and a hearing in order for the debt to obtain treatment as an administrative expense. If the debt was not incurred in the ordi-

nary course of business, or the court does not enter an order approving the post-petition debt incurred outside the ordinary course of the debtor's business, then the creditor to whom the unsecured debt is owed must stand in line with all other prepetition unsecured creditors. *See Martino v. First National Bank of Harvey (Matter of Garofalo's Finer Foods, Inc.),* 186 B.R. 414, 423 (N.D.Ill.1995).

. ■■■ While neither the Bankruptcy Code nor legislative history defines the phrase "ordinary course of business" as used in § 364(a), the language is presumably designed to give the debtor-in-possession or trustee operating the debtor's business the freedom to obtain unsecured credit and incur unsecured debt in the routine and normal course of business without the requirement of obtaining court approval after notice and a hearing. Indeed, "if a debtor had to seek court approval to pay for every expense incurred during the normal course of its affairs, the debtor would be in court more than in business." *Bagus v. Clark (In re Buyer's Club Markets, Inc.)* 5 F.3d 455, 458 (10th Cir.1993). Thus, through a synthesis of case law, courts have developed a workable analytical framework for determining whether an activity is within the debtor's "ordinary course of business." *Committee v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y.1986), *rev'd on other grounds,* 801 F.2d 60 (2nd Cir.1986). The resulting legal standard has evolved into two identifiable tests. In *Armstrong World Industries v. James A. Phillips, Inc. (In re James A. Phillips, Inc.),* 29 B.R. 391 (S.D.N.Y.1983), the district court set forth what has become known as the "creditor expectation" test:

> The touchstone of "ordinariness" is … the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have

no right to notice and hearing, because their objections are likely to relate to the bankrupt's chapter 11 status, not the particular transactions themselves.

*Id.* at 394. *Accord In re Century Brass Prod.,* 107 B.R. 8, 11–12 (Bankr.D.Conn. 1989). The creditor expectation test "examines the debtor's transactions from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a different nature from those he accepted when he decided to extend credit." *Johns–Manville,* 60 B.R. at 616. An element of the creditor expectation test, reformulated as the vertical dimension test, is that a creditor would not expect the debtor to be engaged in transactions that, by their "size, nature, or both are not with the day-to-day operations of a business and are therefore extraordinary." *Waterfront,* 56 B.R. at 35 (reformulating the creditor expectation test as the vertical dimension test); *see also Buyer's Club Markets,* F.3d at 458 (when debtor undertakes policy that transcends day-to-day affairs to the potential detriment of creditors, creditors are entitled to prior notice and opportunity to be heard); *Johns–Manville,* 60 B.R. at 617; *Northern Bank v. Metropolitan Cosmetic and Reconstructive Surgical Clinic, P.A. et al. (In re Metropolitan Cosmetic and Reconstructive Surgical Clinic, P.A.),* 115 B.R. 185, 188 (Bankr.D.Minn.1990) ("A good case can be made for the proposition that ordinary course includes only those payments of ordinary day-to-day operating expenses that, while necessary, are relatively insignificant").

■■■ Under the "ordinary course" scenario described in the creditor expectation test, a creditor is well aware that the Code permits the debtor-in-possession to incur expenses in its normal business operations, and would therefore not expect to be given notice and an opportunity to be heard. If, on the other hand, the transaction is one that might be considered unusual, controversial or questionable for the debtor to

undertake during its Chapter 11 case, a creditor would expect to be notified and provided an opportunity to object. *See In re Media Central, Inc.,* 115 B.R. 119, 124 (Bankr.E.D.Tenn.1990). Moreover, "[e]ven if the debtor-in-possession believes its contemplated action would be beneficial to the estate, and even if it later turns out the transaction was beneficial to the estate, if [it] is not in the ordinary course of business, creditors still have the right to notice and hearing before the transaction is entered into." *Id.*

A second dimension of the "ordinary course of business" test is to compare the debtor's business with like businesses to determine whether the disputed transaction is ordinary for the particular type of business concerned. Under this approach, known as the "horizontal dimension test," the court must:

> [C]ompare this debtor's business to other businesses and based on the kind of business it is in, . . . decide whether a type of transaction is in the course of that debtor's business or in the course of some other business. Thus raising a crop would not be the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business.

*Johnston v. First Street Cos. (In re Waterfront Cos.),* 56 B.R. 31, 35 (Bankr.D.Minn. 1985) (rejecting the argument that anything, including an open-ended indemnity agreement which facilitated the debtor's real estate development business, would be in the ordinary course of business); *see also Burlington N.R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700 (9th Cir.1988); *Johns–Manville,* 60 B.R. at 618.

Many courts have applied both tests. *See e.g. Media Central,* 115 B.R. at 124; *Dant & Russell,* 853 F.2d at 704 (describing and applying both the horizontal and vertical dimension analysis); *Johns–Manville,* 60 B.R. at 616–18 (same). However, the horizontal dimension test has been criticized on statutory construction grounds as applicable only to the objective standard in the ordinary course of business defense to preference liability under § 547(c)(2)(C), as redundant of the creditor expectation test, and as difficult to apply. *Garofalo's,* 186 B.R. at 428–30; *accord Rajala v. Langer (In re Lodge America),* 239 B.R. 580, 585 (Bankr.D.Kan.1999) (horizontal dimension test of ordinary course of business does not apply to § 364(a)). While *Garofalo's* criticism of the horizontal dimension test based upon the omission from § 364(a) of the "made according to ordinary business terms" language that is contained in § 547(c)(2)(C) may be challenged,[4] its criticism based upon the redundant nature of the test and its difficulty of application is correct. A reasonable hypothetical creditor would not expect a debtor to incur debt inconsistent with the actions of similar businesses if, indeed similar businesses can be defined. This Court concludes, therefore, that the appropriate legal standard to apply in determining whether Husting's debt owed to

---

**4.** *Garofalo's* statutory construction criticism of the horizontal dimension test is based on the fact that an "ordinary course" defense to preference liability requires that a transfer be "made according to ordinary business terms." § 547(c)(2)(C). This language requires an "objective standard to be shown by the custom in the industry in which the transferee and the debtor are engaged." *Garofalo's,* 186 B.R. at 429. The court in *Garofalo's* reasons that the horizontal dimension test is essentially the same as the "objective" standard in § 547(c)(2)(C) and, if Congress had wanted this standard applied to § 364(a), it "could have required that post-petition credit be obtained within the ordinary course of business terms; however, it chose not to do so." *Id.*

The difficulty with this analysis is that to constitute an "ordinary course" defense under § 547(c)(2), all three prongs of the § 547(c)(2) test must be met for a transfer to be deemed to fall within the meaning of "ordinary course of business." *Garofalo's* exclusion of a test that reflects "ordinary business terms" from the meaning of "ordinary course of business" in § 364(a) is no more correct that concluding that ordinary course in § 364(a) means only the subjective test of the transactions between the "debtor and transferee." § 547(c)(2)(B).

RAM was incurred in the ordinary course of business is the creditor expectation/vertical dimension test.

### D. Application of the "Ordinary Course" Test to the Facts of this Case

RAM argues that, as a real estate development company, it was ordinary for Husting to incur debt to construct the infrastructure at Galena Hills because all developers must construct storm drains, sewer, curb and gutter, sidewalk and street improvements. The work performed by RAM was of the same nature and scope as any contractor would perform on a similarly-sized project and, RAM argues, the Construction Agreement, invoices, fees charged and services performed are similar to other such projects. Further, RAM produced evidence that all the work for which RAM billed Husting was ultimately approved by the appropriate municipal authorities. Thus, according to RAM, the debt incurred by Husting on account of work done by RAM falls squarely within the ordinary course of business. The Court disagrees.

The evidence is uncontroverted that real estate developers install infrastructure such as that constructed by RAM on projects similar to Galena Hills, and that RAM's work was of sufficient quality to gain municipal approval. Also uncontroverted is the evidence that it was necessary to repair, or remove and replace, significant portions of Construct Tech's work.

■ However, RAM attempted to prove its entitlement to administrative expense status by qualifying a real estate developer, Terry Diehl (Diehl), as an expert witness to opine that the debt owed to RAM

was incurred by Husting in the ordinary course of its business. Diehl qualified as an expert pursuant to Fed.R.Evid. 702 through his substantial real estate development experience. The Court, however, in keeping with its gatekeeping responsibility, concludes that RAM failed to establish by a preponderance of the evidence, *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), that Diehl's opinion regarding whether RAM's claim was incurred in the ordinary course of business was admissible because his methodology could not be proved under the test set forth in *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (ruling that the factors outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) apply not only to scientific testimony, but to all expert testimony).[5] The objective of the *Daubert* gatekeeping requirement is to "ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167. *See also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1166 (10th Cir.2000) (reviewing application of some of the factors listed in *Daubert* to a determination of market value). The *Daubert* reliability factors include, but are not limited to, whether a theory can or has been tested, whether it has been subjected to peer review, whether there are any known error rates, whether any standards or controls exist, and whether there is general acceptance of the theory in the scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.[6]

---

5. An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir.1997) ("[I]t seems exactly backwards that experts who purport to rely on general

engineering principles and practical experience might escape screening by the district court simply by stating that their conclusions were not reached by any particular method or technique.").

6. Recent amendments to Fed.R.Evid. 702 add the following language to the rule:

Some of these non-exclusive factors may be inapplicable to non-scientific testimony, or an expert witness relying solely or primarily on experience. However, under these circumstances, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Advisory Committee Notes, Amendments to Fed.R.Evid. 702 (effective December 1, 2000). The expert's testimony should also be grounded in an accepted body of learning or experience in the expert's field. *See, e.g., American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Testimony after Daubert,* 157 F.R.D. 571, 579 (1994) ("[W]hether the testimony concerns economic principles, accounting standards, property valuation or other non-scientific subjects, it should be evaluated by reference to the 'knowledge and experience' of that particular field.").

Diehl, as a professional and competent real estate developer, is certainly capable of making experience-based observations about his industry in non-opinion form, and the Court allowed his testimony describing the practices in the real estate development business. *Smith v. Ingersoll–Rand Co.,* 214 F.3d 1235 (10th Cir. 2000) (allowing that portion of expert's testimony that defined damages, but excluding quantification testimony because it did not meet reliability test). However, under *Daubert* and *Kumho,* he cannot qualify as an expert competent to testify about what constitutes the "ordinary course of business" for the purpose of evaluating an administrative claim in a Chapter 11 case. No evidence was presented that Diehl had any familiarity with either the creditor expectation/vertical dimension test or the horizontal dimension test courts employ to determine ordinary course, and therefore his opinion testimony was not focused on facts that would tend to prove whether either test was met. Moreover, even if his methodology had been reliable and his opinion regarding whether RAM's debt was incurred in the ordinary course of business had been admitted, it would have spoken only to the horizontal dimension test for ordinary course of business, which the Court declines to employ for the reasons set forth above.[7]

---

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*
Amendments to Fed.R.Evid. 702 (effective December 1, 2000) (emphasis added).

7. Even assuming, *arguendo,* that Diehl had focused his attention on the correct set of facts, his description of his methodology supports a conclusion that it was unreliable. Diehl testified that he arrived at his conclusion regarding whether RAM's debt was incurred in the ordinary course of Husting's business using the following methodology: He reviewed RAM's invoices and compared the unit costs in relation to what Diehl customarily paid for similar goods and services, and he also compared the quantities used, finding they did not exceed the quantities customary for similar projects in the industry. Diehl reviewed RAM's bid proposal and analyzed the Construction Agreement and found both similar to cost basis contracts he had seen previously, although he indicated that a cost basis contract was unusual as was a bi-monthly billing period. No evidence was presented that Diehl, or anyone else, had ever used such methodology before at arriving at an ordinary course determination, or that this method could or had been tested by anyone else, or that it enjoyed widespread acceptance. It was apparent that the methodology was developed solely for the purpose of this trial. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) (one factor is whether a expert is testifying about matters growing naturally from research they have conducted independent of the litigation, or whether it has been developed expressly for the purposes of testifying). At best, Diehl's methodology was a subjective comparison of the Contract Agreement, invoices and fees charged in Husting with similar contracts and fees charged to his own company.

■ Consideration of the remainder of the admissible evidence leads to a conclusion that under the creditor expectation or vertical dimension test, there are a number of circumstances in this case that would place the Husting/RAM transactions outside the ordinary course of business. First, although the unsecured debt incurred by Husting is ordinary in the sense that developers almost always have to incur construction debt, the transaction in this case, in which nearly one million dollars of debt was incurred, represents a major event in the development process for Husting and is the single most significant transaction to have taken place in the case during the time that Husting was a debtor in possession. Moreover, entering into an all-encompassing development contract is something that should only happen once in the development process—it is neither routine nor ordinary in the sense of normal day-to-day operations. *See Waterfront,* 56 B.R. at 35 ("Some transactions, either by their size, nature or both, are not within the day-to-day operations of a business and are therefore extraordinary.").

Second, even if the magnitude and significance of RAM's transaction with Husting did not, by itself, take the transaction outside the "ordinary course," the fact that RAM was not hired solely to develop Husting's property, but also to correct defective work done by another contractor, compels such a conclusion. At best, it is ordinary and foreseeable to creditors that a developer will contract once to improve raw ground. However, it is neither ordinary nor foreseeable that a developer will contract twice for development and be required to pay the second contractor to tear out and correct the defective work of the first before adding value to the project.

Third, the debt incurred on account of work done by RAM fails to qualify as "ordinary course" because a substantial part of RAM's work was performed on property owned by Holmes Mesa to satisfy Husting's obligations under the pre-petition Adjoining Subdivisions Agreement.

The Adjoining Subdivisions Agreement was entered into in 1996, and when Husting filed bankruptcy on January 14, 1997, the contract may have been executory (in that the development work had not been completed and what work had been performed by Construct Tech was defective) or it may have been breached and terminated for lack of performance. A reasonable hypothetical creditor would not expect that a real estate developer would enter into a construction contract without resolution of the legal obligations in the underlying contract. The "ordinary course" exception to obtaining court authority does not vitiate the requirement for court-approval of the assumption of executory contracts, nor does it allow the debtor-in-possession in incur post-petition debt to resolve or satisfy a pre-petition obligation. *See generally Cohen v. KDC Financial Serv., Inc. (In re Miller Mining, Inc.),* 219 B.R. 219, 223 (Bankr.N.D.Ohio 1998) (opining that hypothetical creditor would expect to get notice before a pre-petition claim of $17,753.67 was paid; therefore, the transaction failed to meet "reasonable expectation" test and could not be within the "ordinary course").

Fourth, at the time Husting and McKell entered into the Construction Agreement, neither had a clear understanding of what corrective work needed to be done. The Construction Agreement was a time and materials contract and, upon RAM's cessation of work, the costs had substantially exceeded RAM's original bid. An open-ended contract for an unknown amount of work is not a transaction that creditors would ordinarily expect to be entered into by a developer.

Finally, and perhaps most importantly, it is not ordinary for a real estate developer to enter into a contract without a source to pay the amount incurred. In effect, the Construction Agreement was an open-ended arrangement between Husting and RAM in which the parties agreed that RAM would do whatever was necessary to correct deficiencies and complete the pro-

ject, and Husting would, if necessary, pay RAM's invoices from speculative non-debtor sources if funds in the Escrow Accounts were exhausted. The Adjoining Subdivisions Agreement was not a viable source of funding because, by its terms, reimbursement would not occur for up to twenty-four months after final inspection and approval of construction by various municipalities, and then only if certain other conditions were met. The funding from Castle Homes was undefined, but apparently consisted of Castle Homes, as Husting's equity interest holder, purchasing lots from its related entity, the debtor. Castle Homes was also to contribute funds, in some other undisclosed manner, to pay RAM's claim. Reasonable creditors would not expect that a developer would incur close to one million dollars in debt without a more certain source of funds to repay that debt. As such, the transaction was extraordinary in both scope and nature. It is precisely the type of arrangement of which creditors would expect to be given notice to afford them an opportunity to object.

 Because this case was submitted for a judgment on partial findings, the Court would be remiss if it did not consider whether there was an equitable reason why RAM's administrative claim should be allowed. No one in this case doubts that RAM performed professional and high quality work under the Construction Agreement. However, approval of RAM's claim in spite of the above ruling would be tantamount to retroactive notice and approval, which cannot be given unless the Court is confidant that the debt would have been authorized if a timely application had been made. *In re American Cooler Co.*, 125 F.2d 496, 497 (2nd Cir. 1942); *In re Massetti*, 95 B.R. 360 (Bankr. E.D.Pa.1989). For the reasons set forth above, it is highly unlikely that approval for Husting to incur the debt to RAM would have been given under the terms and conditions of the Construction Agreement. Nor has RAM been able to provide

any reasons why approval was not sought in the first instance, given its knowledge that Husting was in a Chapter 11 proceeding at the time the contract was executed. *See In re Land*, 943 F.2d 1265, 1265 (10th Cir.1991) (reflecting that *nunc pro tunc* approval is only appropriate in the most extraordinary circumstances, and is not justified by simple neglect).

## CONCLUSION

For the foregoing reasons, the Court hereby finds that RAM has failed to carry its burden of proving that the debt incurred by Husting in favor of RAM was within the ordinary course of Husting's business as contemplated under § 364(a). Therefore, it is hereby

**ORDERED,** that the Trustee's motion for judgment on partial findings is granted and RAM's Motion for Allowance of Administrative Expense is denied.