In re GAROFALO'S FINER FOODS,
INCORPORATED, Debtor.

Philip V. MARTINO, not individually,
but solely as Trustee, Plaintiff,

v.

FIRST NATIONAL BANK IN
HARVEY, Defendant.

Bankruptcy No. 90 B 08112.
Adv. No. 92 A 00108.

United States Bankruptcy Court,
N.D. Illinois, E.D.

Feb. 17, 1994.

958

Earl S. Rappaport, Richard T. Reibman and Paul J. Gaynor, Schwartz, Cooper, Greenberger & Krause, Chicago, IL, for First Nat. Bank in Harvey.

F. John McGinnis, Keith A. Goldberg and Faye B. Feinstein, Altheimer & Gray, Chicago, IL, for Philip V. Martino, Trustee.

Philip V. Martino, Rudnick & Wolfe, Chicago, IL, Trustee.

### MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the complaint of Philip V. Martino, as trustee (the "Trustee") of the estate of Garofalo Finer Foods, Inc. (the "Debtor"), against First National Bank in Harvey (the "Bank"). The ultimate question the Court must decide is whether the repayments made to the Bank as a result of extensions of overdraft credit made by the Bank to the Debtor, having been undertaken without notice to creditors or without Court approval, are avoidable and recoverable for the benefit of the estate. Prior to trial, the Trustee filed a motion for summary judgment on which the Court reserved ruling. For the reasons set forth herein, the Court, having considered the testimony, pleadings, exhibits, and affidavits, hereby denies the motion for summary judgment because of material factual issues. After consideration of all evidence adduced at trial, the Court finds that the Bank's post-petition extensions of overdraft credit to the Debtor and subsequent repayment of the sums with estate funds violated 11 U.S.C. §§ 362 and 364, as well as the provisions of prior extant cash collateral orders. These repayments are avoidable and recoverable under 11 U.S.C. §§ 549 and 550. Consequently, the Court enters judgment in favor of the Trustee and against the Bank in the sum of $2,315,901.22 plus costs. The Court denies the Trustee's request for damages and attorneys' fees pursuant to 11 U.S.C. § 362(h).

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (K) and (O).

### II. FACTS AND BACKGROUND

Philip V. Martino is the duly appointed, qualified and acting Trustee of the Debtor's estate. The Bank is a national banking corporation with its principal place of business in Harvey, Illinois. The Bank had a long prior banking relationship with the Debtor which maintained its principal checking accounts at the Bank. The Bank was also a pre-petition unsecured creditor of the Debtor in the sum of $102,000.00. On May 2, 1990, the Debtor filed a Chapter 11 petition. Pursuant to 11 U.S.C. §§ 1107 and 1108, the Debtor retained possession of its assets and operated its business as a debtor-in-possession during the Chapter 11 phase of this case.

As of the petition date, the Debtor had secured debt of approximately $1.7 million, of which approximately $1.3 million was owed to Scot Lad Foods, Inc. and The Midland Grocery Company (hereinafter collectively referred to as the "Suppliers"), with the balance owed to a junior lienholder, Beverly Bank Matteson ("Beverly Bank"). The Debtor's obligations to the Suppliers and Beverly Bank were secured by, *inter alia,* all of the Debtor's then owned and thereafter acquired inventory, supplies, cash, accounts, accounts receivable, furniture, fixtures, equipment and proceeds thereof. The Court entered two series of cash collateral orders authorizing the Debtor to use the cash collateral (as defined in 11 U.S.C. § 363(a)) of the Suppliers on the one hand, and Beverly Bank on the other, on a limited basis, pursuant to operating budgets submitted by the Debtor, and granting adequate protection to the Suppliers and Beverly Bank. *See* Plaintiff's Exhibit Nos. 1 and 20.

The last cash collateral order was entered on November 13, 1990, which authorized the Debtor to use cash collateral through the confirmation or rejection of the Debtor's amended plan of reorganization. Like the earlier orders, the last cash collateral order ratified and approved the terms of the documents evidencing the Debtor's indebtedness and security interests to the Suppliers and Beverly Bank. The last order also found that the pre-petition security interests granted were valid, perfected liens and security interests in and to the Debtor's pre-petition assets, not subject to any defenses. As adequate protection for the use of their cash collateral, the Court granted the Suppliers and Beverly Bank continuing liens and security interests in and to the Debtor's post-petition assets, whether then existing or thereafter acquired, including proceeds, products and accessions thereof, to the same extent and priority as their respective pre-petition liens and security interests.

The cash collateral orders also granted to the Suppliers, as adequate protection for the use of their cash collateral, an administrative expense under section 364(c)(1), with priority over all other costs and expenses of administration, including those arising under Chapter 7 of the Bankruptcy Code. Specifically, the cash collateral order of November 13, 1990 stated:

> In consideration of Suppliers' consent to the aforesaid use of cash collateral and to provide Suppliers with adequate protection pursuant to Sections 361 and 363(e) of the Code, Debtor shall grant to Suppliers a general and continuing lien upon and security interest, to the same extent and priority as Suppliers' pre-petition liens and security interests [in the post-petition collateral].

*See* Plaintiff's Exhibit No. 1, p. 8. Furthermore, both series of cash collateral orders provided for their provisions to survive any order of confirmation or conversion, and for the liens and security interests of the Suppliers' and Beverly Bank to maintain their priority until the Suppliers' and Beverly Bank's claims were satisfied. *Id.* at p. 18. Additionally, the cash collateral orders stated that their provisions "shall be binding upon ... the other parties in interest in this Proceeding...." *Id.* at p. 17. The Bank had actual notice of the pendency of the case and was represented by counsel who was involved, to some extent, in the hearings leading to the entry of the cash collateral orders. The Bank is a party in interest with actual knowledge of these proceedings as one of the Debtor's largest unsecured creditors. Indeed, the confirmed plan made specific provisions for another claim held by the Bank secured by an automobile.

The Debtor filed a plan of reorganization and a disclosure statement on November 5, 1990. The Debtor's plan was confirmed by consent on March 4, 1991. *See* Defendant's Exhibit No. 1. Approximately five weeks after confirmation, however, the Debtor presented a motion to vacate the order of confirmation. *See* Defendant's Exhibit No. 3. The Debtor alleged in the motion that it was unable to meet its projections and therefore could not make the proposed plan payments. The Court denied the motion to vacate the order and thereafter converted the case to Chapter 7 on April 11, 1991. Subsequently, the Trustee was appointed.

The Trustee investigated the facts surrounding the surprising failure of the reorga-

nized Debtor. This investigation resulted in the Trustee's six-count second amended complaint, seeking the following relief: (1) Counts I through III alternatively allege that previously undisclosed overdraft credit was extended by the Bank to the Debtor post-petition and violated sections 364(b), 364(c) and 364(d) respectively, and the Trustee seeks to avoid and recover all such payments to the Bank under sections 549 and 550; (2) Count IV alleges that the repayment of the Bank's unauthorized post-petition extension of overdraft credit violated the cash collateral orders; (3) Count V seeks relief pursuant to sections 362(a)(3) and 362(a)(4) as the Bank's post-petition conduct in taking the Debtor's funds deposited into the Debtor's account at the Bank and applying such funds to repay itself for the overdraft credit constituted willful violations of the automatic stay under section 362(h), thus entitling the Trustee to actual damages, including costs, attorneys' fees and punitive damages. The Trustee voluntarily dismissed Count VI which sought relief pursuant to sections 362(a)(3) and 362(a)(6) for certain other transfers totalling $8,314.22.

### III. *ARGUMENTS OF THE PARTIES*

The Trustee contends that the extensions of overdraft credit by the Bank were unsecured and outside the ordinary course of business under section 364(a), and therefore required notice to the creditors and Court approval under section 364(b)–(d), which was not obtained. The Trustee maintains that because Court authorization was not obtained for the extensions of credit or for repayment of the sums, the Trustee is entitled to recover the repayments of the overdrafts under sections 549 and 550. Further, the Trustee argues that in blatant and knowing disregard of the provisions of the cash collateral orders, the Bank extended overdraft credit to the Debtor and applied the Suppliers' cash collateral in repayment of the Debtor's overdraft obligation, while the Debtor's obligations to the Suppliers and other administrative claimants remained unpaid. Additionally, the Trustee contends that the Bank's actions of so applying the Debtor's funds to repayment of the unauthorized extensions of overdraft

credit constituted violations of the automatic stay under sections 362(a)(3) and 362(a)(4).

The Bank argues that the extensions of overdraft credit were made in the ordinary course of business. Thus, according to the Bank, no court authorization was necessary pursuant to section 364(a), and no action lies against it under sections 549 and 550. Further, the Bank contends that it has a security interest in the form of a statutory lien pursuant to 810 ICLS 5/4–210 as well as a common law banker's lien which may not be avoided under 11 U.S.C. § 545. Moreover, the Bank maintains that the Debtor's secured creditors consented to or waived their right to challenge the Bank's extensions of post-petition credit and the repayment of same with estate funds. In addition, the Bank also argues that the subsequent deposits were not avoidable transfers of the Debtor's property. Rather, the deposits were allowable administrative expenses repaid to the Bank which it is entitled to retain. Finally, the Bank argues that if the relief requested by the Trustee is granted, the estate will be unjustly enriched.

### IV. *DISCUSSION*

### A. *MOTION FOR SUMMARY JUDGMENT*

To prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) reads in part:

> [T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In 1986, the United States Supreme Court decided a trilogy of cases which encourage the use of summary judgment as a means to dispose of factually unsupported claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the moving party to show that no genuine issue of material fact is in dispute. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Matsushita,* 475 U.S. at 585–586, 1355–56. There is no genuine issue for trial if the record, taken as a whole, does not lead a rational trier of fact to find for the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–250, 106 S.Ct. at 2511 (citations omitted); *see also Valley Liquors Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.1987), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). Moreover, all reasonable inferences to be drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991); *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

For the reasons set forth herein, the Court finds that the Trustee is not entitled to summary judgment because there are material issues of fact, including, but not limited to, whether the extensions of overdraft credit were in the ordinary course of business, whether the repayments to the Bank were willful violations of the automatic stay, and with respect to the amounts of damages claimed. Accordingly, the Court denies summary judgment and turns to the evidence adduced at trial to decide the merits of the complaint.

**B. *TRIAL ON COUNTS I–V OF THE COMPLAINT***

**1. Counts I–III—What Constitutes the Ordinary Course of Business Under 11 U.S.C. § 364**

The main controversy at bar focuses on the phrase "ordinary course of business" as used in section 364(a). Section 364(a) authorizes a debtor-in-possession to obtain unsecured credit and incur unsecured debt "in the ordinary course of business" without court approval, and in turn, provides the creditor with administrative expense priority. Section 364(a) provides in significant part:

> If the trustee is authorized to operate the business of the debtor … unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(a). The Bank maintains as its principal defense that its extensions of overdraft credit, and their repayment via subsequent deposits, fall within the purview of section 364(a) because same were "within the ordinary course of business." Thus, no Court approval or notice and hearing were required to allow the Debtor to incur the overdraft debt or for the Bank to repay itself for covering otherwise NSF checks through subsequent deposits.

If the overdraft credit extended by the Bank was not in the ordinary course of business pursuant to section 364(b), however, a debtor-in-possession may obtain unsecured credit other than under subsection (a) of section 364, allowable as an administrative expense under section 503(b)(1) only with court authorization after notice and a hearing. 11 U.S.C. § 364(b); *see also In re Regensteiner Printing Co.,* 122 B.R. 323, 326 (N.D.Ill.1990). The legislative history to subsection (b) indicates that Congress intended that the type of borrowing by a debtor-in-possession that was other than in the ordinary course of business, included obtaining unsecured credit, or incurring debts in order to wind up a liquidation case, *or to obtain a substantial loan in an operating case.* See H.R.Rep. No. 595, 95th Cong., 1st Sess. 346–347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 57 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5843, 6302–6304 (emphasis added). The Trustee argues that the Bank's extensions of overdraft credit are not within the ordinary course of business, and hence the Bank should have sought Court approval of same pursuant to section 364(b).

**962**

 The phrase "ordinary course of business," although used in several sections of the Bankruptcy Code, is not expressly defined therein. *See* 11 U.S.C. §§ 363, 364(a) and 547(c)(2)(B). The ordinary course of business exception to notice and hearing for post-petition financing serves an important function in the reorganization process by allowing debtors to conduct their affairs without excessive judicial involvement and the attendant costs and delays. *See In re Johns–Manville Corp.,* 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986). The ordinary course of business standard is intended to allow a debtor "the flexibility it needs to run its business and respond quickly to changes in the business climate." *Id.* at 617. At the same time, it protects creditors from dissipation of the estate's assets. *Habinger, Inc. v. Metropolitan Cosmetic & Reconstructive Surgical Clinic, P.A.,* 124 B.R. 784, 786 (D.Minn.1990).

Courts have attempted to define the phrase "ordinary course of business" by creating a two-prong test: a "vertical dimension" test and a "horizontal dimension" test. *Manville,* 60 B.R. at 616–618. Several courts have utilized this approach. *See In re Dant & Russell, Inc.,* 853 F.2d 700, 704–706 (9th Cir.1988) (analyzing section 363); *Huennekens v. Marx,* 154 B.R. 214, 225–227 (Bankr. E.D.Va.1993) (analyzing section 363); *General Electric Capital Corp. v. Hoerner,* 143 B.R. 840, 855 (Bankr.W.D.Mich.1992) (analyzing section 364(a)); *In re Blumer,* 95 B.R. 143, 147–148 (9th Cir. BAP 1988) (analyzing section 364(a)); *Habinger,* 124 B.R. at 786 (analyzing section 363); *In re C.E.N., Inc.,* 86 B.R. 303, 305 (Bankr.D.Me.1988) (analyzing section 364(a)).

 The first prong, the vertical dimension test, sometimes denominated the creditor's expectation test, examines whether the transaction at issue subjects a hypothetical creditor to economic risks different from those accepted when such creditor initially extended credit to the debtor. This test was originally set forth in *In re James A. Phillips, Inc.,* 29 B.R. 391 (S.D.N.Y.1983). The *Phillips* court stated:

> [t]he touchstone of "ordinariness" is ... the interested parties' reasonable expecta-

tions of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing because their objections to such transactions are likely to relate to the bankrupt's Chapter 11 status, not the particular transactions themselves.

*Manville,* 60 B.R. at 616–617, *quoting Phillips,* 29 B.R. at 394.

 This test was adopted, but rephrased as whether "the transactions are within the day-to-day business of the debtor without some kind of separate authorization." *In re Waterfront Cos.,* 56 B.R. 31, 35 (Bankr. D.Minn.1985). The *Waterfront* court further pertinently noted that "[s]ome transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary." *Id.* This test allows courts to first look at a debtor's pre-petition business practices and conduct. *Manville,* 60 B.R. at 617. The primary focus of this test is on the debtor's internal operations. *Id.* Moreover, the nature of the debtor's business prior to the bankruptcy filing is compared to its course of conduct post-petition. *Id.* The pre-petition activities which guide courts in ascertaining whether a transaction is in the ordinary course of business are only the starting point. Courts must consider the kind of changing circumstances that are inherent in the creditor's reasonable expectations standard. *Id.* Thus, changes between pre-petition and post-petition business activity alone are not per se evidence of extraordinariness. *Id.* The size, nature and type of business, and the size and nature of the transactions in question are relevant to determine whether the transactions are ordinary. *United States ex rel. Harrison v. Estate of Deutscher,* 115 B.R. 592, 598 (M.D.Tenn.1990). A creditor's expectation can be inferred by comparing a debtor's pre-petition and post-petition conduct. *Habinger,* 124 B.R. at 786.

 The second prong, the horizontal dimension test, sometimes referred to as the industry wide test, involves a comparison of the debtor's business to similar businesses to determine whether the transaction at issue is

in the course of the debtor's business. *Manville*, 60 B.R. at 618. The court must determine whether a type of transaction is in the course of the debtor's business or in the course of some other business. *Waterfront*, 56 B.R. at 35. The primary focus of this analysis is external—this business vis-a-vis similar businesses. *Manville*, 60 B.R. at 618. A transaction can be ordinary and still occur only occasionally. *Dant & Russell*, 853 F.2d at 704. The transaction need not have been common; it need only be ordinary. *Id.* For example, "raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business." *Waterfront*, 56 B.R. at 35.

In order for a transaction to qualify as within the ordinary course of business, it "most likely" must satisfy both prongs of the test. *In re Media Cent., Inc.*, 115 B.R. 119, 124 (Bankr.E.D.Tenn.1990). Whether a transaction is in the ordinary course of business is a question of fact. *See e.g., In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir.1988). Regardless of the labels used, both tests provide an analytical framework for determining whether a transaction is in the ordinary course of business. *Media Cent.*, 115 B.R. at 124.

Several courts have held that a bank's covering of overdrafts is not generally in the ordinary course of business. *See e.g., In re Lite Coal Mining Co.*, 122 B:R. 692, 695 (Bankr.N.D.W.Va.1990); *In re SMB Holdings, Inc.*, 77 B.R. 29, 32 (Bankr.W.D.Pa. 1987); *cf. In re Fulghum Constr. Corp.*, 872 F.2d 739 (6th Cir.1989) (extension of overdraft credit does not constitute a transaction with the ordinary course of business exception under section 547(c)(2)(C)); *In re Hills Oil & Transfer, Inc.*, 143 B.R. 207, 209 (Bankr.C.D.Ill.1992) (extending a line of credit through overdrafting of a checking account was not the industry practice or standard so as to be considered within the ordinary course of business exception to a preferential transfer under section 547(c)(2)(C)).

### a. Application of the Two–Prong Test to the Facts at Bar

Applying the horizontal and vertical dimensions tests to the facts at bar, it is clear that the Bank's post-petition extensions of overdraft credit to the Debtor, and the subsequent repayments, did not occur in the ordinary course of the Debtor's business to fit within the safe harbor of section 364(a). Under the vertical dimension test, neither the Bank nor the other interested parties, such as the Suppliers and Beverly Bank, would expect one of their grocery store customers as a Chapter 11 debtor-in-possession to be maintaining an undisclosed overdraft position on its principal checking account, which increased over time both as to amount and frequency on almost a daily basis, often for sums in excess of $200,000 to pay ordinary operating expenses. Comparing the Debtor's pre-petition and post-petition conduct, it is clear the Debtor's overdraft activity changed dramatically post-petition. *See* Plaintiff's Exhibit No. 4R. The evidence adduced at trial established that the Debtor had a long-standing banking relationship with the Bank which dated back to the 1960's. The Debtor maintained its checking account at the Bank both pre-petition and post-petition. The Debtor had experienced a previous successful bankruptcy reorganization case prior to the instant one in which the Bank was involved. During the one and one-half years prior to the filing of this bankruptcy case, the Debtor occasionally drew checks without sufficient funds in its account to cover the checks. The Bank, in turn, honored these overdrafts. Pre-petition, the Bank occasionally extended overdraft credit to the Debtor in amounts less than $10,000 which the Debtor in turn quickly repaid within a day or two.

Following the filing of this bankruptcy case, the frequency and magnitude of the overdrafts increased. *See* Plaintiff's Exhibit No. 4R. The checks drawn by the Debtor consisted of payments to entities who provided goods and services to the Debtor. Post-petition, especially during the period from fall 1990 through confirmation, the Bank was often extending overdraft credit to the Debtor in amounts over $200,000 which were not

repaid for extended periods. *Id.* Specifically, the Bank extended overdraft credit to the Debtor on ninety-four separate days post-petition by honoring the Debtor's checks when there were insufficient funds in the Debtor's account to cover such checks. The frequency and magnitude of these post-petition extensions of overdraft credit were significantly different from the pre-petition extensions of credit. By September 1990, the Debtor was overdrawn at the Bank almost daily. From January 8, 1991, the Debtor was overdrawn every day. By February, 1991, the Bank was extending credit to the Debtor on a daily basis for sums often in excess of $200,000. The funds that the Debtor subsequently deposited into the account at the Bank were applied by the Bank as a credit against the extensions of overdraft credit. On March 12, 1991, the situation further drastically changed when the Bank stopped extending credit. Thereafter, the Bank failed to honor the Debtor's overdrafts, but continued to apply subsequent deposits to reduce the balance owed on the overdraft credit down to $25,091.18.

The Bank's contention that honoring overdrafts was in the ordinary course of business is belied by the totality of the documentary evidence and testimony. The testimony adduced at trial supports the conclusion that the Debtor's post-petition conduct changed dramatically from its pre-petition conduct. Dominick Garofalo, the Debtor's President, testified to the marked change in overdraft magnitude and frequency between the Debtor's pre-petition and post-petition checking account activity. He stated that the overdraft relationship changed in the fall of 1990. *See* Trial Transcript at p. 224. He further testified that once the overdrafts increased in amount and frequency, it took longer for the Debtor to cover the overdrafts with subsequent deposits. *Id.* Garofalo also testified that he was in almost daily contact with the Bank regarding the overdrafts. *Id.* at p. 226. He further stated that he had six to eight personal post-petition meetings with representatives of the Bank concerning the overdraft situation. *Id.* Garofalo testified that he never had a personal pre-petition meeting with Bank representatives concerning the overdrafts of the Debtor. *Id.* at pp. 226–228.

Additionally, the Bank's President, Dennis Irvin, admitted that in the fall of 1990, the Debtor's overdrafts increased in frequency and amount and took longer to clear up. *Id.* at pp. 74, 79–80. Irvin admitted that the Debtor's account was a major concern to the Bank, and that the only meetings he ever had with a customer regarding overdrafts were with the principals of the Debtor and their attorney. *Id.* at pp. 78–80. Moreover, Lawrence Hochberg, the Vice President of the Bank, testified that in October 1990, the Debtor's overdrawn account was one of the Bank's largest credit problems and a topic of daily discussion at the Bank. *Id.* at pp. 189–190. The Bank's Chairman of the Board, Donald King, also testified that the Debtor's overdraft relationship with the Bank changed significantly post-petition. *Id.* at p. 154. King stated that the pre-petition accommodation between the Bank and the Debtor required the Debtor to cover the overdrafts in a day or two, and he admitted that the Debtor no longer abided by this accommodation post-petition. *Id.* at pp. 151–152, 154. King recommended that the Bank no longer extend overdraft credit to the Debtor because the Debtor failed to quickly cover the larger overdrafts with subsequent deposits as it had pre-petition. *Id.* at pp. 153–154. David Keller, the Bank's own expert, admitted that the overdraft relationship between the Bank and the Debtor changed post-petition in the fall of 1990. *Id.* at pp. 283–284. Finally, Greg Mader, who testified as an expert in the banking practices of retail grocery stores, also stated that the frequency and magnitude of the Bank's post-petition extension's of overdraft credit to the Debtor were highly unusual and outside of the ordinary course of business. *Id.* at pp. 355–356.

The Bank disputes the effect of this testimony, contending that its honoring of the overdrafts was routine and customary. The Bank cites to the opinion testimony of Keller that the overdraft relationship between the Bank and the Debtor was in the ordinary course of business. Specifically, Keller testified:

> [T]he payment of overdrafts pre-bankruptcy were long standing a significant number of years, I believe probably in excess of 20

years ago. It was common for the debtors [sic] to over draw their accounts on a frequent basis. It was common for the bank to honor those overdrafts.

Upon the filing of bankruptcy, the debtor in possession continued the same pattern that he [sic] had prior to the bankruptcy of overdrawing accounts. The bank was consistent with its prior action and continued to honor those overdrafts. They to me appear in the ordinary course of business both in the actions that were taken and also the type of overdraft.

Trial Transcript at pp. 280–281.

Pursuant to Federal Rule of Evidence 702, the Court can admit testimony of an expert to aid in understanding the evidence or deciding an issue of fact.[1] Rule 702, however, does not make the testimony of the expert conclusive as to the issue even if uncontradicted by another expert. *In re Opelika Mfg. Corp.,* 66 B.R. 444, 450 (Bankr.N.D.Ill. 1986). The Court is free to make its own determination of the issues. *Id.; O'Conner v. Commonwealth Edison Co.,* 807 F.Supp. 1376, 1391 (C.D.Ill.1992), *aff'd,* 13 F.3d 1090 (7th Cir.1994) (court's hands are not inexorably tied to an expert's opinion, and it need not accept uncritically opinion testimony espoused by expert merely because his credentials render him qualified to testify). "The rule [Rule 702] does not mean that the trier of fact must rely upon expert testimony which is unsatisfactory or that the trier of fact is precluded from making an independent determination of the facts, regardless of how complicated or 'specialized' the subject matter may be." *Id., quoting Parents in Action on Special Education v. Hannon,* 506 F.Supp. 831, 836 n. 3 (N.D.Ill.1980).

The expert testimony proffered by the parties did not materially assist the Court. This testimony was self-serving and not persuasive. The Court is of the opinion that the totality of the weight of credible factual evidence establishes, contrary to the opinion testimony of Keller, that the extensions of overdraft credit from the Bank to the Debtor changed dramatically after the filing of the bankruptcy petition, and were not made or repaid in the ordinary course of business between the Debtor and the Bank as long established pre-petition.

Looking at the second prong of the test—the horizontal dimension test—the Bank's own records for its commercial customers for which it provided overdraft credit during 1989–1991 indicate that the overdraft credit it extended to the Debtor was not in the ordinary course of its business. *See* Plaintiff's Exhibit No. 6. During this period the Bank extended overdraft credit to only twenty of its commercial customers. During the period from February 1990 to February 1991, the number of commercial accounts at the Bank ranged from 847 to 867. Of the twenty commercial customers for which the Bank extended overdraft credit from January 1989 to April 1991, only four were in the grocery business. During the period from January, 1989 to April 1991, the Bank extended overdraft credit to only one commercial debtor-in-possession. The Bank did not extend overdraft credit to any bank customer in any amount in excess of $50,000, except to the Debtor. *See* Plaintiff's Exhibit No. 6; Trial Transcript at p. 63. Mader, who testified as the Bank's expert in the banking practices of retail grocery stores, admitted that the frequency and magnitude of the Bank's post-petition extensions of overdraft credit to the Debtor were highly unusual and outside of the ordinary course of its business. *Id.* at pp. 355–356.

Post-petition, the Debtor executed a new corporate resolution authorizing it to continue to maintain its checking account at the Bank. Paragraph three of the Bank's corporate resolution with the Debtor provides:

Be It Further Resolved, that the Bank, in its sole discretion may honor, any checks, drafts or orders which may be drawn against insufficient funds in an account of [the Debtor] at the Bank, regardless of whether the person executing such check, draft or order is otherwise authorized to

---

1. Federal Rule of Evidence 702 provides:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

borrow money under this Resolution provided, however, *that no action taken by the Bank shall constitute a course of dealing or otherwise obligate the Bank to honor or pay any overdraft in the future;* it is understood and agreed that any funds advanced by the Bank to pay an overdraft shall be payable to the Bank by the [Debtor] on demand.

Plaintiff's Exhibit No. 9 and Defendant's Exhibit No. 4 (emphasis added). This resolution contains a provision granting the Bank unilateral discretion and authority to extend overdraft credit to the Debtor and to hold the Debtor liable on demand for the credit so advanced. This was not a formal credit agreement expressly negotiated and entered into to cover the Debtor's overdrafts. The Debtor did not seek or obtain Court approval authorizing it to execute the resolution, or authorizing the Bank to advance funds to the Debtor in order to honor checks for which there were insufficient funds in the checking account.

The Bank argues that the mere existence of the resolution, and the fact that it was executed when the Debtor continued to use its checking account at the Bank, compels the conclusion that the Bank, in the ordinary course of business, reasonably anticipated that the Debtor might overdraw its account, and the Bank, in the ordinary course of business, knew banking customers overdraw their accounts often enough so that it was appropriate to establish the overdraft policy at the inception of the banking relationship. The Court rejects this argument. The Court finds that it is logically inconsistent to conclude that the overdrafts were paid in the ordinary course of the Debtor's business with the Bank, but only on the strength of a Bank resolution which gave the Bank *sole* discretion to honor NSF checks. The Bank seeks to elevate the resolution into a formal agreement for repayment of overdrafts. The resolution is not such a formal agreement negotiated between it and the Debtor specifying credit limits, terms of repayment, costs or fees therefore, or any other conditions. Also, it is illogical to conclude that if it was in the ordinary course for the Bank to honor overdrafts on the account and use subsequent deposits to pay off those overdrafts or to reduce the balance owed for same, then it also was in the ordinary course of business for the Bank to *unilaterally* stop honoring overdrafts, but continue to apply subsequent deposits.

While it may be in the ordinary course of business for a banking customer to occasionally overdraw its checking account, the Court is not willing on these facts to find that the Bank's aggregate extensions of overdraft credit to the Debtor were made or repaid in the ordinary course of business for purposes of section 364(a), given the marked change of frequency and amount of the overdrafts from the pre-petition period in contrast to the pattern that evolved post-petition. Accordingly, the Court concludes that the relevant case law applied to the evidence adduced at trial demonstrates that the Bank's extensions of overdraft credit to the Debtor were outside the ordinary course of business in violation of sections 364(b), 364(c) and 364(d).

Further, if the credit extended by the Bank to the Debtor is considered secured via the statutory lien claimed by the Bank or a common law banker's lien, the Trustee further maintains that the Bank violated sections 364(c) and 364(d) by failing to obtain Court approval of the extensions of overdraft credit to the Debtor. The Court agrees with this argument. In order for the Bank to receive a priority for secured credit out of the ordinary course of business it should have sought the safe harbor of section 364(c) after notice and hearing. If it wanted to prime the liens of the Suppliers and Beverly Bank, it could have sought the benefits of section 364(d) after notice and hearing. The Bank did neither and must suffer the consequences.

b. **The Trustee is Entitled to a Single Recovery Under Counts I–III Pursuant to 11 U.S.C. §§ 549 and 550**

The Trustee asserts that he is entitled to recovery of the aggregate transfers constituting repayments of the overdrafts under Counts I–III pursuant to sections 549(a) and 550(a)(1). Section 549(a) empowers the Trustee to avoid certain authorized transfers and all unauthorized post-petition transfers

of property of the estate, and provides in pertinent part:

> (a) the trustee may avoid a transfer of property of the estate—
>
>> (1) that occurs after the commencement of the case; and
>>
>>> (B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a)(1)(B).

Section 549 allows the Trustee to avoid a post-petition secured loan that has not been authorized. There are two exceptions to this rule—the first protects gap creditors in an involuntary proceeding, and the second protects good faith purchasers of real property. *See In re Baxco Corp.*, 148 B.R. 855, 859 (Bankr.N.D.Ill.1992). The Bank is not protected by either exception. In addition, Federal Rule of Bankruptcy Procedure 6001 provides, "[a]ny entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof." As previously discussed, the Bank has not demonstrated that the post-petition extensions of overdraft credit and the subsequent repayments thereof were "in the ordinary course of business" to be insulated under the safe harbor of section 364(a).

Further, section 550(a)(1) and (c) provides in relevant part:

> (a) to the extent that a transfer is avoided under section ... 549 ... of this title, *the trustee may recover,* for the benefit of the estate, *the property transferred, or,* if the court so orders, *the value of such property,* from—
>
>> (1) the initial transferee of such transfer. . . .
>
> (c) The trustee is entitled to only a single satisfaction ·under subsection (a) of this section.

11 U.S.C. § 550(a)(1) and (c) (emphasis added).

### c. *The Amount of Damages to be Recovered*

■ The Court must now ascertain the proper sum of damages to be assessed against the Bank and recovered by the Trustee. The Trustee argues, and the Court agrees, that the correct computation of damages can be derived by looking to the aggregate total amount the Bank repaid itself with estate funds from the Debtor's account, namely $2,315,901.22. *See* Plaintiff's Exhibit No. 4R. The Trustee cites *In re Photo Promotion Associates, Inc.,* 881 F.2d 6 (2d Cir.1989) in support of his position.

The Bank maintains that there is no legal basis for requiring it to disgorge this amount of money. It argues that damages should be measured on a "net result" or "eventual result" theory. The Bank claims that the eventual result was that the post-petition trade creditors of the Debtor's estate were paid and there was no reduction in the value of the estate. In fact, the only results were that the Debtor's trade creditors, including the Suppliers, were paid more quickly than they would have been paid, and they were paid $25,076.18 (the amount of the overdrafts not repaid, as claimed by the Bank) at the expense of the Bank, thus enriching the estate by that amount. The Bank contends that the maximum amount of damages cannot exceed $260,156.92, which was the single largest amount of credit extended by the Bank at any one time. The Bank's expert witness, Jack Erlich, testified that the proper measure of damages would be the highest negative post-petition balance in the Debtor's checking account. This occurred on February 15, 1991, in the sum of $260,156.92. The Bank cites *In re Knight,* 76 B.R. 857 (Bankr. M.D.Ga.1987) for the proposition that the eventual result of the post-petition dealings between the Debtor and the Bank, that being the reduction in the value of the estate, should be the measure of damages, not the aggregate amount of the post-petition transfers.

In reply, the Trustee argues that if the Court were to accept the Bank's "high credit" theory of damages, then each period that the Debtor overdrafted its account and then brought the balance positive again would be a discrete loan, and thus under this theory, the Trustee would be entitled to recover $1,275,704.31 ($1,300,795.49 (credit extended) less $25,091.18 (ending negative balance) equals $1,275,704.31).

It is the job of the Trustee to administer the estate and for the Court to adjudicate

disputes arising under and in accordance with the Bankruptcy Code. As the Seventh Circuit noted:

> The fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness.... The function of equitable considerations in a bankruptcy proceedings is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted.

*In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 791 F.2d 524, 528 (7th Cir. 1986). The prevailing doctrine and rule of statutory construction employed by the Supreme Court in cases decided under the Bankruptcy Code in recent years is the plain meaning of the statute. *See, e.g., Union Bank v. Wolas*, —— U.S. ——, ——, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991); *United States v. Nordic Village, Inc.*, —— U.S. ——, —— – ——, 112 S.Ct. 1011, 1015–1016, 117 L.Ed.2d 181 (1992); *Dewsnup v. Timm*, —— U.S. ——, —— – ——, 112 S.Ct. 773, 780–787, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting).

For purposes of section 550(a)'s application, while it is practically impossible for the Trustee to recover from the Bank the actual deposits made by the Debtor to its account that the Bank applied to reduce the overdraft credit extended, the value of such deposits can be readily computed and easily valued to equal the unauthorized repayments. The evidence is uncontroverted that the Bank made ninety-four separate extensions of overdraft credit when it paid checks presented for payment totalling $2,340,977.40 and received subsequent payments, via later deposits made by the Debtor into the account at the Bank, which were credited against these overdraft extensions, in the aggregate sum of $2,315,901.22.

It is undisputed that when the Bank paid checks presented for payment which were drawn on the Debtor's account, but for which there were insufficient funds at the times of presentment, it extended credit to the Debtor. When the Debtor subsequently made deposits into the account to cover the over-

drafts, and the Bank set off those deposited funds against the debt created by the overdrafts, the Debtor transferred funds of the estate to the Bank. *See* 11 U.S.C. §§ 541(a)(6) and 541(a)(7) (defines what constitutes property of the estate); 11 U.S.C. § 101(58)[54] (broad definition of "transfer" under the Bankruptcy Code). Under Counts I, II and III of the complaint, the Trustee can recover from the Bank, as the initial transferee, the aggregate amount of estate funds transferred to the Bank without Court authority or approval post-petition to repay the overdrafts in violation of section 364. *See* 11 U.S.C. §§ 549 and 550(a)(1); *see also Brook v. Republic Bank*, 150 B.R. 74 (Bankr. M.D.Fla.1993) (application of funds deposited in debtor-in-possession bank account against post-petition debt avoidable under section 549). Under Plaintiff's Exhibit No. 4R, the aggregate amount of the unauthorized repayments to the Bank totalled $2,315,901.22.

What the Bank did in repaying itself was to subvert the priorities of the Bankruptcy Code without notice and prefer itself in repayment rather than adhere to the section 364(c) super-priority in favor of the Suppliers and Beverly Bank established under the cash collateral orders. The Bank repaid itself using cash collateral on which the Suppliers and Beverly Bank had prior liens. The Bank effectively received a secret unauthorized post-petition preferred repayment of the overdraft credit extended to the Debtor. The Bank's actions do not constitute fraud, nor were they tainted with any tortious wrongful scienter. No evidence of fraud or similar wrongdoing are present, but that is not the gravamen of sections 549 and 550.

The measure of recovery is the plain and unambiguous statutory language of section 550, not the "net result" or the average highest balance. Hence, the Court declines to follow the *Knight* case. The damages are equal to the unauthorized repayments to the Bank, which are avoidable and recoverable under Counts I through III of the complaint. The Bank cites several cases for the proposition that the mitigation of damages concept should be utilized in measuring damages. The use of this theory would in fact reduce the amount of recovery to the Trustee. The

Court will not apply this concept in measuring damages as same is not justified under the plain language of section 550—"the value of such property" equals the aggregate amount of the unauthorized repayments to the Bank. The Bank must disgorge the unauthorized post-petition preferential payments under sections 549 and 550 in the sum of $2,315,901.22. The Bank will have an allowed claim under 11 U.S.C. § 502(h) upon disgorging this amount. When a borrowing is out of the ordinary course of business and prior court authorization is not obtained, the lender may be relegated to the status of a general unsecured creditor. 2 *Collier on Bankruptcy,* ¶ 364.03 at 364–8 (15th ed. 1993).

### 2. Count IV—The Extensions of Overdraft Credit Violated the Cash Collateral Orders

Count IV of the complaint alternatively alleges that the Bank's extensions and repayments of overdraft credit to the Debtor violated the cash collateral orders entered by the Court. The cash collateral orders restricted the Debtor's use of cash collateral as defined in section 363(a) to specific budgeted items, and granted the Suppliers a super-priority section 364(c) administrative first priority lien on all of the Debtor's post-petition assets. The Trustee maintains that the Bank knowingly disregarded the provisions of the cash collateral orders by extending overdraft credit to the Debtor and applying the Suppliers' and Beverly Bank's cash collateral, which was deposited into the Debtor's bank account, to the Debtor's overdraft obligation.

The Court finds that the repayment of the Bank's unauthorized extensions of overdraft credit with the estate funds, subject to the cash collateral orders, constituted violations of the cash collateral orders. The Bank effectively gave itself an unauthorized priority claim which it repaid in part from subsequent deposits made by the Debtor while the Suppliers and other administrative claimants remained unpaid. The cash collateral orders were binding upon the Bank. *See* Plaintiff's Exhibit No. 1, p. 17. The Bank had knowledge of the entry of those orders.

### a. The Trustee, the Suppliers and Beverly Bank Did Not Waive Their Rights to Object to the Extensions of Overdraft Credit

The Bank argues that the Debtor, its bankruptcy attorney, the Suppliers, and Beverly Bank were aware of the post-petition extensions of overdraft credit, and that their failure to object to same constitutes consent to or waiver of the Bank's actions. The Trustee strongly disagrees with this conclusion. He claims that he did not waive his right to protect the interest of all the creditors. The Court agrees with that point. The Trustee was not appointed until after the case converted and after the Bank's actions in repaying itself were concluded. Further, the Trustee argues that even if the Suppliers and Beverly Bank had knowledge of the overdrafts and consented or waived their rights to assert violations of the cash collateral orders, that would be a defense only to Count IV and only with respect to the use of Beverly Bank's and the Suppliers' interests in the cash collateral. Furthermore, the Trustee maintains that the Bank has itself effectively waived the defense of waiver.

Pursuant to Federal Rule of Civil Procedure 8(c), incorporated by reference in Federal Rule of Bankruptcy Procedure 7008, "a party shall set forth affirmatively ... waiver, and any other matter constituting an avoidance or affirmative defense." Fed. R.Civ.P. 8(c). The Bank first set forth its defense of waiver in its proposed conclusions of law filed just prior to the trial date. The defense of waiver is itself waiveable. *McKnight v. General Motors Corp.,* 908 F.2d 104, 108 (7th Cir.1990), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991). The Court finds that the Bank has waived the defense of waiver by failing to allege same in an affirmative pleading. Even if the Bank has not waived its right to assert the defense of waiver, such defense on the facts is insufficient to counter the allegations of Count IV.

Waiver is a voluntary relinquishment of a known right or privilege. *Havoco of America, Ltd. v. Sumitomo Corp. of America,* 971 F.2d 1332, 1337 (7th Cir.1992).

Waiver requires three elements: (1) existence of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit. A prerequisite ingredient of the waiver of a right or privilege consists of an intention to relinquish it. *TMF Tool Co. v. Siebengartner,* 899 F.2d 584, 590 (7th Cir.1990). "Before a party is deemed to have waived or relinquished a right or remedy available to it under the law, a clear and distinct manifestation of such an intent must be found." *American Nat. Bank & Trust Co. v. K–Mart Corp.,* 717 F.2d 394, 398 (7th Cir.1983).

The Bank has not shown evidence of any express or implied intent by the Trustee, the Suppliers or their agents, or Beverly Bank or its agents to waive their respective rights to assert violations of the cash collateral orders. The evidence viewed as a whole compels the Court to conclude that there was no actual or constructive knowing waiver by the Suppliers or Beverly Bank of their rights under the cash collateral orders. The testimony of Greg Joseph, Retail Accounting Manager for The Midland Grocery Company, established that the Suppliers and Beverly Bank were not advised by him of the Debtor's overdrafting and the evolving increased extensions of credit and repayment to the Bank. Joseph testified that he rendered accounting services to the Debtor during the pendency of the bankruptcy case. He stated that he became aware that the Debtor had overdrafts on its checking account. *See* Trial Transcript at pp. 307–308. Joseph also testified that he kept the Debtor's records strictly confidential and that he did not communicate any information regarding the Debtor's finances to any employee of the Suppliers unless requested to do so by the Debtor or its attorneys. *Id.* at pp. 330–333.[2] Additionally, Dan Farrell, an employee of Roundy's, parent company to the Suppliers, was in charge of the Debtor's account for the Suppliers. *Id.* at p. 85. He, however, did not know of the Debtor's overdrafts. *Id.* at pp. 102–103. Accordingly, the Suppliers were not advised of

the overdrafts, and thus did not effectively consent to the use of their cash collateral for the repayment of the extensions of overdraft credit. Consequently, the evidence does not support the Bank's contention that the Suppliers consented to the Bank's actions or waived their right to assert violations of the cash collateral orders.

Finally, the Bank attempted to show at trial that the monthly operating reports of the Debtor (Defendant's Group Exhibit No. 6) informed the Suppliers of the existence and extent of the overdraft credit the Bank was providing the Debtor. The fatal flaw in this argument is that the monthly operating reports were not prepared or filed on a timely basis. These reports were first tendered to the Court at the confirmation hearing in March, 1991, well after the overdrafts and partial repayments thereof had transpired. Those reports do not reflect the number, extent, frequency or amounts of the overdrafts or the substantial repayments. The evidence does not show that any party had prior knowledge of the transactions between the Bank and the Debtor. Although the Debtor and its counsel apparently knew of the overdraft situation, the Court, other creditors, and the Trustee did not. Whether or not the Suppliers and Beverly Bank had knowledge of the overdrafts is irrelevant.

### 3. Count V—Violations of 11 U.S.C. § 362

Next, the Court turns to the issue of whether the Bank's application of the Debtor's funds deposited into the Debtor's checking account at the Bank to repay the unauthorized extensions of overdraft credit constitutes violations of the automatic stay. Section 362(a) of the Bankruptcy Code provides in relevant part:

> (a) a petition filed under section 301 ... of this title ... operates as a stay, applicable to all entities, of—
>
> > (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

---

**2.** Any conflict of interest Joseph may have as an employee of the Suppliers, doing accounting work on contract with the Debtor, is irrelevant

for purposes of sections 549 and 550, and whether the Bank violated the automatic stay of section 362(a).

(4) any act to create, perfect, or enforce any lien against property of the estate.

11 U.S.C. §§ 362(a)(3) and 362(a)(4).

The dual purpose of the automatic stay was adequately expressed by the legislative history surrounding the passage of section 362(a):

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 49 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5835, 6296–6297; *see also In re Vitreous Steel Products Co.,* 911 F.2d 1223, 1231–1232 (7th Cir.1990); *Martin–Trigona v. Champion Federal Sav. & Loan Asso.,* 892 F.2d 575, 577 (7th Cir.1989).

**a. *The Bank's Actions Constituted a Violation of the Automatic Stay***

 The Court finds that the Bank violated the automatic stay when it applied funds deposited into the Debtor's account to repay the unauthorized extensions of overdraft credit. Those funds deposited into the Debtor's account were property of the estate under sections 541(a)(6) and 541(a)(7), and cash collateral as defined in section 363(a), and the Bank took actions to obtain possession of and control over that property of the estate. Accordingly, this unauthorized conduct by the Bank constitutes a violation of section 362(a)(3). *See Knopfler v. Glidden,* 149 B.R. 517, 521 (Bankr.N.D.Ill.1992); *In re BNT Terminals, Inc.,* 125 B.R. 963, 971 (Bankr.N.D.Ill.1990). In addition, the Bank violated section 362(a)(4) because its unauthorized post-petition application of the Debtor's funds, in its possession, to repay the unauthorized extensions of overdraft credit constituted an enforcement of its alleged banker's lien against property of the estate. These actions are void. *Knopfler v. Glidden,* 149 B.R. at 522. Moreover, the Trustee is entitled to recover all estate funds transferred to the Bank in violation of section 362. *Id.* at 520 (any transfer in violation of the automatic stay is void, without legal effect, and reversible).

**b. *The Bank's Actions Were Willful Under Section 362(h)***

 Willful is defined as a "deliberate and intentional act done with the knowledge that the act is in violation of the stay." *In re Ziegler,* 136 B.R. 497, 499 (Bankr.N.D.Ill. 1992), *quoting In re Forty–Eight Insulations, Inc.,* 54 B.R. 905, 909 (Bankr.N.D.Ill. 1985). To prevail, the Trustee must show that the Bank took action that violated the automatic stay while it knew that the automatic stay was in effect. *Taborski v. United States IRS,* 141 B.R. 959, 965 (N.D.Ill.1992); *Ziegler,* 136 B.R. at 499. The Trustee does not have to prove that the Bank had a specific intent to violate the stay. *Taborski,* 141 B.R. at 966: *In re Waltjen,* 150 B.R. 419, 427 (Bankr.N.D.Ill.1993). A violation of the automatic stay is willful even if the Bank believed itself justified in taking the action found to be violative of the stay. *In re Alberto,* 119 B.R. 985, 993 (Bankr.N.D.Ill.1990).

 The Court finds that the Bank willfully violated the automatic stay under sections 362(a)(3) and 362(a)(4). The Bank knew that the Debtor was in Chapter 11, yet it repaid most of the overdraft credit without the knowledge or consent of the bankruptcy court. When the Bank refused to further extend overdraft credit, it continued applying the Debtor's deposits made to its account to off set the remaining sums owed the Bank. These acts are willful violations of the automatic stay. The issue then becomes whether

the Trustee is entitled to damages under section 362(h).

### c. The Trustee Is Not Entitled to Relief Under Section 362(h)

The Trustee maintains that he is entitled to damages for the Bank's willful violation of the automatic stay. Section 362(h) provides for such damages and states as follows:

An *individual injured* by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h) (emphasis added).

The weight of persuasive recent authority holds that section 362(h) provides a remedy only to aggrieved natural persons. *In re Goodman,* 991 F.2d 613 (9th Cir.1993); *In re Chateaugay Corp.,* 920 F.2d 183 (2d Cir.1990); *In re Prairie Trunk Railway,* 125 B.R. 217, 220 (Bankr.N.D.Ill.1991), *aff'd, Consolidated Rail Corp. v. Gallatin State Bank,* No. 91 C 2204, slip op., 1992 WL 611175 (N.D.Ill. May 15, 1992). *Contra In re Atlantic Business & Community Corp.,* 901 F.2d 325, 329 (3d Cir.1990); *Budget Service Co. v. Better Homes of Virginia, Inc.,* 804 F.2d 289, 292 (4th Cir.1986). The Trustee recognizes that this Court, in *Prairie Trunk,* held that only an individual is entitled to damages under section 362(h). The Trustee maintains, however, and rightfully so, that the Court did not address the issue of whether a case trustee is an "individual" for purposes of section 362(h) or whether he stands in the shoes of individual creditors. The Trustee cites several cases for the proposition that other courts have repeatedly awarded trustees representing estates of corporate debtors compensatory damages, such as costs and attorneys' fees under section 362(h). *See e.g., In re Fugazy Express,* 124 B.R. 426 (S.D.N.Y.1991), *appeal dismissed,* 982 F.2d 769 (2d Cir.1992); *Nigro v. Oxford Dev. Co.,* 137 B.R. 182 (Bankr.W.D.Pa.1992); *In re Omni Graphics, Inc.,* 119 B.R. 641 (Bankr.E.D.Wis.1990); *In re Bair Island Marina & Office Center,* 116 B.R. 180 (Bankr.N.D.Cal.1990); *In re M & J Feed Mill, Inc.,* 112 B.R. 985 (Bankr.W.D.Mo.

1990); *In re Marine Pollution Service, Inc.,* 99 B.R. 210 (Bankr.S.D.N.Y.1989); *In re Sechuan City, Inc.,* 96 B.R. 37 (Bankr.E.D.Pa. 1989). These cases, however, contain no discussion of whether a bankruptcy trustee constitutes an "individual" for purposes of section 362(h). These cases simply allow recover of damages under section 362(h) to trustees without discussion of this issue.

A recent case held that the remedies afforded by section 362(h) are available to a trustee because a trustee is an individual. *See Havelock v. Taxel,* 159 B.R. 890 (BAP 9th Cir.1993). *Havelock* stated that the trustee in that case was not any less an individual for purposes of section 362(h) simply because he was the representative of the estate. The court further opined that the trustee himself was injured by the violations of the stay because the creditors repeatedly interfered with the performance of his duties under 11 U.S.C. § 704. *Id.* at 903. The trustee was found to have been injured by the creditors' actions in repeatedly interfering with the performance of his duties in collection of monies of the estate.

The Court finds that the Trustee is an "individual" because he is a natural person, but he has not been injured for purposes of section 362(h). He has not been personally injured or in any way damaged in his representative capacity. Some estate creditors are "individuals" while others are not. The Trustee is pursuing this adversary proceeding in his representative capacity as a bankruptcy trustee for the benefit of the estate for the property value to be recovered under section 550(a). This Court has also held that only debtors and pre-petition creditors are within the scope of protection under section 362(h). *See In re Prairie Trunk Railway,* 112 B.R. 924 (Bankr.N.D.Ill.1990). The Court's subsequent decision further restricted that holding to debtors and pre-petition creditors who are individual human beings. *Prairie Trunk,* 125 B.R. at 222. Even though the Trustee is a human being, he is not prosecuting this adversary proceeding on his own behalf nor proven any injury to himself personally or as the representative of the estate. He was not even appointed trustee of the Debtor's estate at the time the

subsequent repayments (which are the stay violations) occurred.

Consequently, the uninjured Trustee is not entitled to compensatory damages, including attorneys' fees under section 362(h). The actual damages sustained in this case are measured by the recovery limned by section 550(c) to a single satisfaction for the benefit of the estate as provided in and measured by the provisions of section 550(a) equal to the value of the property transferred, namely the aggregate of repaid overdrafts applied by the Bank which total $2,315,901.22. Even though the Trustee may not recover additional damages and fees under section 362(h), he recovers the post-petition transfers of the Debtor's property made in violation of' the automatic stay, plus costs of this matter under Counts I through III pursuant to his avoidance and recovery powers in sections 549 and 550. The estate will be made whole by recovery of the avoidable transfers plus costs. The Bank's ordinary course defense under section 364(a) is not supported by the facts, but was not so patently frivolous or specious to subject it to the taxing of the Trustee's fees or those of his attorneys.

## C. THE BANK'S AFFIRMATIVE DEFENSES

### 1. The Bank's Statutory Lien Pursuant to 810 ILCS 5/4–210

The Bank asserts, as an affirmative defense, a statutory lien on the funds in the

Debtor's bank account pursuant to 810 ILCS 5/4–210.[3] This statute, which is identical to Uniform Commercial Code section 4–210, addresses a collecting bank's lien on items. It does not address the common law banker's lien. *Cf.* Uniform Commercial Code Comment 1 to section 4–210 ("[this section] does not derogate from the banker's general common law lien or right of setoff against indebtedness owing in deposit accounts.... Rather [this section] specifically implements and extends the principle as a part of the bank collection process."). The Bank, however, misinterprets this provision. This provision addresses .a collecting bank's lien on items for which it extends provisional credit until it receives final payment on the item. "Collecting bank" is defined as a "bank handling an item for collection *except the payor bank.*" 810 ILCS 5/4–105(5) (emphasis added). "Payor bank" includes "a bank that is the drawee of a draft." 810 ILCS 5/4–105(3). The Bank is not a "collecting bank," but rather was the "payor bank" on the account from which all the Debtor's checks were drawn and paid by the Bank. Thus, the Bank's reliance on this statutory provision is misplaced and without merit.

### 2. The Bank's Assertion of a Common Law "Banker's Lien"

The Bank alleges that it had the right, following the honoring of an overdraft, to credit subsequent deposits to the negative balance resulting from the overdraft, and this

**3.** 810 ILCS 5/4–210 provides as follows:
(a) A *collecting* bank has a security interest in an item and any accompanying documents or the proceeds of either:
 (1) in case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;
 (2) in case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given, whether or not the credit is drawn upon or there is a right of charge-back; or
 (3) if it makes an advance on or against the item.
(b) If credit given for several items received at one time or pursuant to a single agreement is withdrawn or applied in part, the security interest remains upon all the items, any accompanying documents or the proceeds of either. For the purpose of this Section, credits first given are first withdrawn.

(c) Receipt by a *collecting* bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents, and proceeds. To the extent and so long as the bank does not receive final settlement for the item or give up possession of the item or accompanying documents for purposes other than collection, the security interest continues and is subject to the provisions of Article 9 [footnote omitted], except that:
 (1) no security agreement is necessary to make the security interest enforceable (subsection (1)(a) of Section 9–203);
 (2) no filing is required to perfect the security interest; and
 (3) the security interest has priority over conflicting perfected security interest in the item, accompanying documents or proceeds.
810 ILCS 5/4–210 (emphasis added).

right was superior to the Suppliers' security interests pursuant to 810 ILCS 5/9–306(4)(d).[4] Pursuant to this allegation, the Bank has obliquely asserted, without further discussion, a common law banker's lien.

Under Illinois law, in certain situations, notwithstanding the absence of a written security agreement, a financial institution may be entitled to a "banker's lien" on deposits at the institution. Such a right is not an actual lien, inchoate or otherwise, because one cannot have a lien on his own property. *Bonhiver v. State Bank of Clearing*, 29 Ill.App.3d 794, 804, 331 N.E.2d 390, 398 (1st Dist.1975), *citing Heiple v. Lehman*, 272 Ill.App. 513, 520 (1933), *aff'd*, 358 Ill. 222, 192 N.E. 858 (1934). The common law right of set off provides that a bank may apply its depositor's account for a debt he owes to the bank. *First Nat. Bank v. Lewis*, 186 Ill. App.3d 16, 19, 134 Ill.Dec. 124, 126, 542 N.E.2d 124, 126 (1st Dist.1989), *appeal denied*, 127 Ill.2d 615, 136 Ill.Dec. 585, 545 N.E.2d 109 (1989). Under Illinois common law, a bank has the power to apply a deposit to the payment of such depositor's indebtedness only when there are mutual demands and debts between the parties and this right of set off arises at the time the depositor's indebtedness to the bank has matured. *Selby v. DuQuoin State Bank*, 223 Ill.App.3d 104, 107, 165 Ill.Dec. 621, 623, 584 N.E.2d 1055, 1057 (5th Dist.1991); *Bonhiver*, 29 Ill. App.3d at 803–804, 331 N.E.2d at 398; 5 Illinois Law and Practice, *Banks* § 193 (1953 and 1993 Supp.). A bank's rights to apply a deposit to a depositor's debt are limited, however, once it has received notice of a third party's interest in the funds on deposit. *Liberty Sav. Asso. v. Sun Bank of Jacksonville*, 572 F.2d 591, 596 (7th Cir.1978). A limitation to the right of set off exists where a bank had knowledge of a third person's interest in deposited funds, or notice of facts sufficient to put the bank on inquiry as to the character of the deposit, and the bank's right

of set off may be subject to the rights of the third party. *In re Tonyan Constr. Co.*, 28 B.R. 714 (Bankr.N.D.Ill.1983). In discussing the exception, the *Tonyan* court stated:

> Ordinarily, where a party deposits funds in a bank, the funds become the property of the bank and the bank becomes the debtor of the depositor. In such a case, there is mutuality of obligation, out of which the bank's right of setoff arises. This right of setoff exists even where trust funds are deposited to the individual account of a fiduciary, or where funds held for the use of or as security for another are credited to the depositor's individual account. Where, however, a bank has knowledge of a third person's interest in deposited funds, or notice of facts sufficient to put it upon inquiry as to the true character of the deposit, the debtor-creditor relationship is altered and the bank's right of setoff is subject to the rights of such third party. Knowledge that a depositor's business customarily requires the handling of funds in which others have an interest, coupled with other circumstances of equitable cognizance tending to individualize a deposit or line of deposits, may constitute notice of facts sufficient to put the depositary bank upon inquiry as to the true nature of the deposit. (citations omitted)

28 B.R. at 725–726.

The Court finds that the Bank was not entitled to set off the Debtor's overdraft indebtedness owed to it for the following reasons. First, the Bank was on notice of the cash collateral orders which gave the Suppliers a lien on all of the Debtor's cash collateral, which included the deposits made into the Debtor's account at the Bank. Second, there was no specific agreement between the Bank and the Debtor regarding when the debts created by the overdrafts were due. Thus, no definite maturity date was established for when the overdraft credit had to be repaid. The resolution given by

---

4. 810 ILCS 5/9–306(4)(d) provides in significant part:

 (4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

 (d) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is

 (i) subject to any right to set-off....

810 ILCS 5/9–306(4)(d).

the Debtor to the Bank provided that overdrafts covered by the Bank were to be payable by the Debtor on demand, but no evidence was adduced that the Bank ever made a formal demand to the Debtor.

### 3. The Bank's Affirmative Defense of Unjust Enrichment

 Next, as a second affirmative defense, the Bank asserts that, in the event that the relief sought by the Trustee is granted, the estate will be unjustly enriched. The Court will not deviate from the plain language of section 550 and apply such common law equitable considerations to uphold otherwise avoidable transfers. *Baxco,* 148 B.R. at 860. Unjust enrichment is not a defense to an otherwise avoidable transfer. *Id.; see also In re Vichele Tops, Inc.,* 62 B.R. 788, 792 (Bankr.E.D.N.Y.1986) (the court refused to apply the unjust enrichment defense in a Chapter 7 case because of the interest of the general creditor body). The funds recovered by the Trustee in this adversary proceeding will be distributed in accordance with the priorities in 11 U.S.C. § 726 and only to those creditors with valid, allowed claims. Hence, neither the Trustee nor the creditors of this estate, including the Bank, will be unjustly enriched by requiring the Bank to disgorge and turn over to the estate the funds it set off and received post-petition in violation of sections 364(b), 364(c), 364(d), 362(a)(3) and 362(a)(4), and the extant cash collateral orders.

The Court rejects the Bank's unjust enrichment defense. Although the estate was temporarily benefitted when the Bank covered overdrafts aggregating $2,340,977.40 upon honoring the Debtor's checks to third party payees, such payees (not the estate or the Debtor) received the economic benefit of the money when the checks were paid rather than returned for insufficient funds. The Debtor's overdrafts were subsequently repaid to the Bank in the aggregate amount of $2,315,901.22 to the detriment of the Suppliers and Beverly Bank.

### V. CONCLUSION

For the foregoing reasons, the Court hereby finds that the Bank's extensions of over-

draft credit to the Debtor were not within the ordinary course of business as contemplated under section 364(a). The extensions of overdraft credit violated sections 364(b), 364(c) and 364(d), as well as the extant cash collateral orders. The Court further finds that the Bank's repayments of these extensions of overdraft credit with funds of the Debtor's estate constituted willful violations of sections 362(a)(3) and 362(a)(4). Those repayments are avoidable and recoverable under sections 549 and 550 pursuant to Counts I through III. The Court awards the Trustee judgment in the principal amount of $2,315,901.22, plus costs. The Court denies the Trustee's request for damages and attorneys' fees under section 362(h) because he is not an "individual" who was injured or damaged for purposes of that section.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

### ORDER

For the reasons set forth in a Memorandum Opinion dated the 17th day of February 1993, the Court hereby denies the motion of First National Bank in Harvey for summary judgment because of material factual issues. After consideration of all evidence adduced at trial, the Court finds that First National Bank in Harvey's post-petition extensions of overdraft credit to the Debtor were not within the ordinary course of business as contemplated under 11 U.S.C. § 364(a). The extensions of overdraft credit violated 11 U.S.C. §§ 364(b), 364(c) and 364(d), as well as the extant cash collateral orders. The Court further finds that the Bank's repayments of these extensions of overdraft credit with funds of the Debtor's estate constituted willful violations of 11 U.S.C. §§ 362(a)(3) and 362(a)(4). Those repayments are avoidable and recoverable under 11 U.S.C. §§ 549 and 550 pursuant to Counts I through III. The Court enters judgment in favor of the Trustee and against First National Bank in Harvey in the principal sum of $2,315,901.22, plus costs. The Court denies the Trustee's re-

quest for damages and attorneys' fees under 11 U.S.C. § 362(h) because he is not an "individual" who was injured or damaged for purposes of that section.